Filed 5/22/13 Opinion on rehearing

Certified for Publication

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| JAY DOW,<br><br>        Plaintiff and Appellant,<br><br>    v.<br><br>LASSEN IRRIGATION COMPANY,<br><br>        Defendant and Respondent. | C068550<br><br>(Super. Ct. No. 4573) |

APPEAL from a judgment of the Superior Court of Lassen County, F. Donald Sokol, Judge. Reversed with directions.

Mennemeier, Glassman & Stroud and Margaret Carew Toledo and Stephen Lau; O'Laughlin & Paris and William Paris for Plaintiff and Appellant.

Kronick, Moskovitz, Tiedemann & Girard and Scott A. Morris and William T. Chisum for Defendant and Respondent.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Assistant Attorney General, Joseph Barbieri, Deputy Attorney General; Michael A.M. Laufer, Andrew H. Sawyer, and Marianna Aue, for State Water Resources Control Board as Amicus Curiae, upon request of the Court of Appeal.

This water rights case involves the interpretation of a decree in a stream adjudication and, more particularly, the interplay between the right to divert water to storage in a reservoir and the right to divert water for direct application to beneficial use.

1

The specific issue here is whether the trial court correctly interpreted a 1940 judgment and decree in an adjudication of the water rights on the Susan River stream system (the Susan River decree). We conclude the court did not correctly interpret the decree. As we will explain, the trial court erred in determining that paragraph 21 of the decree gives defendant Lassen Irrigation Company (the Irrigation Company) a right to divert water from the Susan River for direct application to beneficial use that is measured by the capacity of the Irrigation Company's three reservoirs (estimated at 31,500 acre-feet). Properly interpreted, the Susan River decree does give the Irrigation Company a right to divert water for direct application to beneficial use, but that right is provided in a different part of the decree and is measured in cubic feet per second (cfs), not acre-feet.[1] Paragraph 21 of the decree dictates when that right of direct diversion (and the Irrigation Company's right to store water) can be exercised, but it does not establish a right to direct diversion itself. Because the trial court erred in construing the decree, we will reverse the court's order and remand the case for the court to enter a new order consistent with this opinion.

---

[1]     For ease of reference, we will sometimes refer to diversion of water for direct application to beneficial use as simply direct diversion, which stands in contrast to diversion of water to storage, from where it is to be applied to beneficial use at a later date. (See *Bazet v. Nugget Bar Placers, Inc.* (1931) 211 Cal. 607, 618 ["Storage of water in a reservoir is not in itself a beneficial use. It is a mere means to the end of applying the water to such use"].)

2

FACTUAL AND PROCEDURAL BACKGROUND[2]

*The Susan River System*

The "Susan River has its source on the east slope of the Sierra Nevada . . . in the southwesterly portion of Lassen County . . . at an elevation of about 7,900 feet. Its channel follows a general easterly direction from Silver Lake through McCoy Flat Reservoir and through Susanville and on to Honey Lake to which it is tributary. . . ."

"Susan River has four important tributaries, namely, Piute Creek which comes in from the north at Susanville, Gold Run Creek and Lassen Creek which come in from the south between Susanville and Johnstonville, and Willow Creek which is tributary from the north above Standish."[3]

---

[2]      In describing the Susan River system, the Irrigation Company's use of water from the river, and the litigation that led to the Susan River decree, we draw liberally from the "Report on Water Supply and Use of Water on Susan River and Tributaries Lassen County, California," prepared by the former Division of Water Resources and dated February 20, 1936 (the hydrographic report), which, along with a stipulation for judgment, was "the only evidence offered or introduced at . . . trial" in the case that resulted in the Susan River decree. The Irrigation Company requested that we take judicial notice of certain portions of the hydrographic report as they "relate[] to and describe[] lands receiving water via direct diversion by [the Irrigation Company]." Plaintiff Jay Dow did not oppose that request. We subsequently asked the Irrigation Company to provide us with a full copy of the hydrographic report, which it did. We take judicial notice of the hydrographic report as a court record (Evid. Code, § 452, subd. (d)(1)) to assist us in interpreting the resulting decree. (See *L. A. Local etc. Bd. v. Stan's Drive-Ins, Inc.* (1955) 136 Cal.App.2d 89, 94 ["The rule with respect to orders and judgments is that the entire record may be examined to determine their scope and effect"].)

        We also draw from the stipulation for judgment and the "Report of Referee" dated June 12, 1937, that followed the stipulation.

[3]      A map depicting the Susan River and its major tributaries is included as an appendix to this opinion.

3

"Under normal conditions the flows of Lassen and Gold Run Creeks and of Susan River above Susanville are fairly well sustained from melting snows until early in June."

*The Irrigation Company's Use Of The River*

The Irrigation Company provides water from the Susan River to irrigate a total of 5,864.7 acres that lie south of the river to the southeast of Susanville.[4] The Irrigation Company owns and operates three reservoirs: McCoy Flat Reservoir (Diversion 6), Hog Flat Reservoir (Diversion 7), and the Leavitt Lake Reservoir (Diversion 239).[5] McCoy Flat Reservoir (which lies west of Susanville) "is situated on the main channel of Susan River and has a maximum capacity of about 13,000 acre feet." The water stored in McCoy Flat Reservoir is "released during the summer to supplement the water stored in Hog Flat and Leavitt Reservoirs" (described hereafter).

Hog Flat Reservoir (which lies east of McCoy Flat and west of Susanville) "is situated on Hog Flat Branch of Susan River and has a maximum capacity of about 6[,]400 acre feet." The water stored in Hog Flat Reservoir is "released during the summer to supplement the water stored in McCoy Flat and Leavitt Reservoirs."[6]

Lake Leavitt (which lies east of Susanville) "is formed by an earth dam or levee about one and three-fourths miles in length which closes the open side of a natural basin." The lake "has a normal capacity of about 12,100 acre-feet and is filled by the diversion of water from Susan River through the A and B Canal." That canal (also known as the

---

[4] The acreage irrigated by the Irrigation Company is "depicted in cross-hatched green on Map Sheets 3 and 6" of the map sheets that were included with the report. Color copies of those map sheets appear in the record on appeal as exhibits 3 and 4 to the request for judicial notice filed by amicus curiae California State Water Resources Control Board. We grant the Board's unopposed request for judicial notice.

[5] This latter reservoir is also referred to as Lake Leavitt.

[6] Both McCoy Flat and Hog Flat Reservoirs lie at an elevation of about 5,500 feet.

Adams and Batcheldor Ditch or A and B Ditch and identified as Diversion 41) runs "from the south side of Big Slough Channel of Susan River." The canal "consists of an earth ditch five and one-fourth miles in length to where it empties into Leavitt Reservoir," and "[a] number of laterals tap the main ditch along its course."[7] At the time of the investigation leading to the Susan River decree, "[t]he maximum capacity of the ditch was measured as 195.0 cubic feet per second and the normal diversion as about 130.0 cubic feet per second."

A few shareholders of the Irrigation Company have land along the A and B Canal and receive some of their water directly from the canal. According to the report, that land amounts to 295.7 acres. The remaining 5,569 acres of land receiving water from the Irrigation Company are irrigated with water released from Lake Leavitt into an outlet canal that is about eight miles long. Thus, nearly 95 percent of the land irrigated by the Irrigation Company is served exclusively by water that passes through Lake Leavitt.

The Irrigation Company also owns the Colony Dam, which is located on the Susan River at the junction with Willow Creek. The dam is "used primarily for regulatory purposes to maintain a steady flow of 20 cubic feet per second of Susan River water passing the dam when diversion of natural flow from the river is being made into Leavitt Lake Reservoir."[8] At the time of the hydrographic report, water could also be diverted at the dam into the Colony Dam Ditch (Diversion 55), which was "used as a supplemental

---

[7]     According to the hydrographic report, a total of 1,760.4 acres belonging to owners who were not part of the Irrigation Company were irrigated by direct diversion from the ditch. Pursuant to a previous stipulation between the Irrigation Company and the predecessors of the owners of those direct diversion rights, those direct diversion rights were limited to a maximum diversion of 16 cfs.

[8]     The basis for the Irrigation Company providing 20 cfs in flow at this point in the river will become apparent later.

direct diversion supply to the water stored in the Leavitt Reservoir." It appears, however, that the Irrigation Company no longer uses this point of diversion at this time.

*The Background Of The Susan River Decree*

Before the litigation that led directly to the Susan River decree, there was a history of "[t]rouble" involving "the use of water and ditches diverting [water] from Susan River." In 1893, a judgment was entered in a case involving water from the Susan River entitled *J.D. Byers et al. v. Chas. K. Hartson, B. H. Leavitt, C. C. Hutchinson, et al.* (Super. Ct. Lassen County, 1893, No. 280). Defendants Leavitt and Hutchinson were the predecessors in interest to the Irrigation Company. The judgment in the *Byers* case gave Leavitt and Hutchinson, "as against the plaintiffs" in that case, "the right to divert the water of Susan River from the channel thereof for storage in their Lake Leavitt Reservoir, and in other reservoirs." In particular, this storage right applied to "all water flowing [in the river] between the first day of March and the first day of July in each and every year in excess of 1000 inches of water measured under a four inch pressure, at a point immediately above the mouth of Willow Creek and in excess of 250 inches of water so measured at said point at all other times of each year." The judgment specified that "[b]y 1000 inches of water measured under a four inch pressure is meant 20 cubic feet of water per second." Thus, between March 1 and July 1, the predecessors of the Irrigation Company could divert to storage as long as they maintained a flow of 20 cfs in the river immediately above Willow Creek, and at all other times they could divert to storage as long as they maintained a flow of 5 cfs at that point.

From 1893 forward, "various groups of water right owners [were] involved in a number of cases of water right litigation on Willow Creek, Gold Run Creek, Lassen Creek, Upper Susan River, and on Piute Creek. The narrow scope of the issues involved rendered unsatisfactory results from the various cases, because as conditions changed different combinations of issues arose which threatened expensive and continued litigation. In view of this situation, more than ninety per cent of the water right owners

6

entered into an agreement during the summer of 1934 to seek an adjudication of each right in respect to all other rights in the Susan River stream system under the court reference procedure of [former] Section 24 of the Water Commission Act.

"Following the above mentioned agreement, the case of J.J. Fleming etal. [*sic*] v. J. R. Bennett, etal. [*sic*], was instituted in the Superior Court of California, in and for the County of Lassen, on July 24, 1934. . . . The case was referred by said court to the [former] Division of Water Resources on August 21, 1934, under the provision of [former] section 24 of the Water Commission Act for investigation and report as referee.

"A survey and map of the diversions and irrigated lands in the Susan River stream system and an investigation of record facts were made by the referee between August 25, 1934 and March 15, 1935. A conference of the water users and their representatives was held at Susanville on March 18, 1935 to acquaint them with the data that had been collected by the Division. A program of future action for expeditio[u]s conduct of the investigation of [the] referee was discussed with the water users at the conference.

"In order to expedite an investigation by the referee of the use of water on Susan River and its tributaries, a tentative schedule for the distribution of waters during the 1935 season was recommended to the water users. The plan of distribution . . . was agreed upon by all of the water users except the owners of the Ridenour, Satica, and Jenkins ranches . . . . The schedule of allotments was based upon an assumed duty of one cubic foot per second to eighty acres of irrigated land and the plan of distribution was to be operative during the 1935 season only.[9] The agreement contained a provision that the legal rights of the various parties should in no way be prejudiced by such distribution of water. It was further agreed that the conference with the Division should be continued

---

**9**     "The term 'duty of water' has been defined to mean the quantity of water necessary to properly irrigate a given tract of land." (*Witherill v. Brehm* (1925) 74 Cal.App. 286, 300.)

until a date to be later fixed by the Division, said date to be subsequent to the end of the 1935 season, when the results of the distribution under the agreement would be available. Water master service was furnished as an incident of the investigation from March 23 to October 17, 1935." The 1935 agreement was based in part on the fact that it "appear[ed] from the data collected by [the] Division that it m[ight] be possible to work out an allocation of the waters of [the Susan River] stream system . . . that w[ould] be acceptable to all of [the] parties [to the suit] and afford the basis for a consent judgment in [the] proceedings."

The tentative allocation set forth in the 1935 agreement consisted primarily of water rights set forth in four schedules, each one of which was "[s]ubject to all of the foregoing rights and provisions" in the agreement.[10] (Schedule 1 addressed rights on Willow Creek and its tributaries. Schedule 2 addressed rights on Hills Creek, Gold Run Creek, Lassen Creek, and Piute Creek. Schedule 3 addressed rights on the Susan River and Willow Creek. As particularly pertinent here, the paragraph of the agreement describing the water rights available under Schedule 3 (paragraph 20) contained the following language with respect to the Irrigation Company: "provided further, that the Lassen Irrigation Company shall be entitled to divert under their right hereinafter provided from the flow of Susan River in excess of 20 cubic feet per second measured above the confluence of said river with Willow Creek during the period from March 1st to July 1st, and from the flow of said river in excess of 5 cubic feet per second measured at said point at all other times." Thus, the rights on the Susan River provided in Schedule

---

[10]   Superior to these four schedules were various water rights on certain small tributaries, most of which allowed the specified users to divert the entire flow of those tributaries. Those particular water rights are not directly pertinent in the present action, and therefore we will not detail them further, except as they are described in the decree. We will refer to these rights as "special class" rights to distinguish them from the "interrelated" rights provided for in the schedules.

8

3 were subject to the Irrigation Company's right to divert, which was provided for later in the agreement. Although the 1935 agreement did not provide any detail on the origin of the minimum flow aspect of this provision, it appears the minimum flow requirements to which the Irrigation Company was subject in the 1935 agreement came from the 1893 judgment in the *Byers* case (discussed above).

Schedule 4 of the 1935 agreement addressed additional rights on the Susan River beyond those in Schedule 3. The Irrigation Company appeared as the first user listed in Schedule 4, with a right to 72.50 cfs under the first of three priority classes in Schedule 4. The 72.50 cfs figure appears to have been derived by dividing the total acreage attributed to the Irrigation Company in the 1935 agreement (5,803.0) by the assumed duty of one cfs to 80 acres of irrigated land and rounding off to the nearest tenth. The paragraph of the agreement describing the water rights available under Schedule 4 (paragraph 21) specified that the "diversion of all allotments set forth in said Schedule 4 shall be limited to the amounts directly applied to beneficial use with the exception of the allotments to Lassen Irrigation Company, and to Clarence E. Dakin, et al., which may be diverted to storage."

The next paragraph of the 1935 agreement (paragraph 22) then specified as follows:

"Subject to the foregoing rights and provisions, Lassen Irrigation Company shall be entitled to impound the natural flow of Susan River and its tributaries in the McCoy Flat, Hog Flat, and Lake Leavitt Reservoirs . . . in an amount equal to the present combined capacity of said reservoirs, or approximately [¶] 39,290 acre feet per annum, [¶] said water to be used for domestic and stock watering purposes and for supplemental irrigation of the lands of the stockholders of said company . . . ."

In February 1936, following the trial distribution under the 1935 agreement, the Division completed the hydrographic report. This report was "comprehensive. It consist[ed] of 195 pages of findings and conclusions and as many or more pages of

9

schedules, tables and plates. It deal[t] with and recommend[ed] findings with respect to 259 claimed rights of water users in the Susan River watershed." (*Fleming v. Bennett* (1941) 18 Cal.2d 518, 525.)

As the Division explained to the court in June 1937 in its "Report of Referee," following the Division's production of its comprehensive hydrographic report, "[a]nother conference of the parties to the action and their representatives was called by the Division of Water Resources on March 31, 1936, at Susanville. A stipulation for judgment containing a plan of settlement of all of the water rights in the Susan River stream system was presented by said Division at the conference. The stipulation was based upon the 1935 schedule of trial distribution with such modifications as appeared necessary from the additional information gathered in 1935."

Paragraphs 14 through 36 of the stipulation for judgment dealt with the special class rights that are not at issue in this proceeding. Paragraphs 37 through 40 dealt with the four schedules of interrelated rights, now numbered three through six.[11] Schedule 3 addressed rights on Willow Creek and on the Susan River below Willow Creek. Like Schedule 2 in the 1935 agreement, Schedule 4 in the stipulation addressed rights on Hills Creek, Gold Run Creek, Lassen Creek, and Piute Creek. Like Schedule 3 in the 1935 agreement, Schedule 5 in the stipulation addressed rights on the Susan River and lower Willow Creek. The paragraph of the stipulation describing the water rights available under Schedule 5 (paragraph 39) contained the same language regarding the Irrigation Company's right to divert that was previously contained in the paragraph governing Schedule 3 in the 1935 agreement. In other words, the stipulation recognized the Irrigation Company's entitlement "to divert under their right hereinafter provided from

---

[11] Schedule 1 of the stipulation consisted of a description of the areas irrigated from the Susan River system and Schedule 2 consisted of a list of the various points of diversion.

10

the flow of Susan River in excess of 20 cubic feet per second measured above the confluence of said river with Willow Creek during the period from March 1st to July 1st, and from the flow of said river in excess of 5 cubic feet per second measured at said point at all other times."

Like Schedule 4 in the 1935 agreement, Schedule 6 in the stipulation addressed additional rights on the Susan River. Again, the Irrigation Company appeared as the first user listed in this schedule. Now, however, the Irrigation Company's right to divert under the schedule was limited to 36.65 cfs. (Indeed, the amounts of all the rights in Schedule 6 of the stipulation were reduced from the corresponding amounts in Schedule 4 of the 1935 agreement.) Paragraph 40 of the stipulation continued to provide that all diversions under what was now Schedule 6 were limited to amounts directly applied to beneficial use with the exception of the allotments to the Irrigation Company and several other users, which could be diverted to storage.

Like paragraph 22 of the 1935 agreement, paragraph 41 of the stipulation recognized the Irrigation Company's right to impound water in its three reservoirs, although the total capacity of those reservoirs was now estimated at 31,500 acre-feet.

Because the stipulation for judgment provided for allocation of the waters of the Susan River system year-round, and not simply during the irrigation season as the 1935 agreement had done, the stipulation contained a new paragraph (paragraph 12) governing seasons of use, to which each of the paragraphs discussing Schedules 3 through 6 expressly referred.[12] Paragraph 12 provided in relevant part as follows:

"[T]he season of diversion of water for general irrigation purposes under the rights hereinafter set forth in Schedules 3, 4, 5, and 6, shall be for continuous usage during the

---

[12] Specifically, each paragraph provided that the parties enumerated in the schedule were entitled to the right to use water in the system "during the seasons hereinbefore defined in paragraph 12."

11

period from March 1 to October 31, . . . and during said period all rights set forth in said schedules shall be superior to the storage rights hereinafter provided in paragraphs 22, 23, 24, 36, 41, 42, and 43 . . . <u>except further</u> that diversion shall be made from the natural flow of Susan River by Lassen Irrigation Company between March 1 and July 1 of each and every year only from the flow of said river in excess of 20 cubic feet per second measured immediately above the confluence of said river with Willow Creek, and at all other times only from the flow of said river in excess of 5 cubic feet per second measured at said point."

As the Division further explained to the court in the "Report of Referee," "[t]he parties to the proceedings desired to continue trial distribution of the waters of the Susan River stream system under the plan contained in the stipulation for judgment during 1936 until the commencement of the haying season to afford a further demonstration of the operation thereof. Circulation of the stipulation for judgment was commenced on July 15, 1936 among the various parties to the action for their approval. Said stipulation for judgment [was] subscribed by 170 parties to the proceedings."

As the Division observed, the Irrigation Company subscribed an identical copy of the stipulation, but with certain reservations. Those reservations were stated in pertinent part as follows:

"Executed by the Lassen Irrigation Company upon the express condition that the exception contained in paragraph 12, commencing line 1, page six, shall be construed to give Lassen Irrigation Company the right to divert, or store up to the present capacity of its reservoirs, estimated at 31,500 acre-feet, from the natural flow of Susan River between March 1st and July 1st of each year when the flow of Susan River is in excess of 20 cubic feet per second, measured immediately above the confluence of said river with Willow Creek, and at all other times when the flow of said river is in excess of five cubic feet per second measured at said point, irrespective of and notwithstanding the allotments granted to users in Schedules 3, 5, and 6 . . . ."

12

In the conclusions of law contained in the "Report of Referee," the Division incorporated virtually verbatim the Irrigation Company's reservations to paragraph 12 of the stipulation for judgment, writing in pertinent part as follows:

"The intent of paragraph[] . . . 12 . . . of the stipulation for judgment as intended by the various signatory parties is more clearly set forth by use of the following language and said paragraph[] . . . 12 . . . should be construed as though written as follows:

"[¶] . . . [¶]

"12 [T]he season of diversion of water for general irrigation purposes under the rights hereinafter set forth in Schedules 3, 4, 5, and 6, shall be for continuous usage during the period from March 1 to October 31, . . . and during said period all rights set forth in said schedules shall be superior to the storage rights hereinafter provided in paragraphs 22, 23, 24, 36, 41, 42, and 43 . . . except further, that Lassen Irrigation Company shall be entitled to divert, or store up to the present capacity of its reservoirs, estimated at 31,500 acre-feet, from the natural flow of Susan River between March 1 and July 1 of each year when the flow of Susan River is in excess of 20 cubic feet per second, measured immediately above the confluence of said river with Willow Creek, and at all other times when the flow of said river is in excess of 5 cubic feet per second measured at said point, irrespective of and notwithstanding the allotments granted to users in Schedules 3 and 6 and to users of third priority class in Schedule 5."

"On April 18, 1940, the court rendered its final decree based in the main on the report filed by the referee." (*Fleming v. Bennett*, *supra*, 18 Cal.2d at p. 520.) Thereafter, in August 1941, the Supreme Court affirmed the decree. (*Id.* at p. 530.)

*The Susan River Decree*

The major provisions of the Susan River decree, on which the resolution of this case turns, are as follows: Paragraph 7 of the decree explains that the water rights involved fall into four classifications. The first set of rights, addressed in paragraphs 22 through 40 of the decree, are of "independent character and absolute priority" because

13

under those rights "the respective parties take all of the flow of various springs and small tributaries and have for more than five years prior to the commencement of this action long continued to do so." The decree describes these rights as "special class" water rights and characterizes them as "independent of each other" and as "superior in priority and in right to all other rights in the Susan River stream system."

The decree describes the other three sets of water rights as "interrelated" water rights. The first set of interrelated rights are "[t]hose which derive their water supply from Willow Creek" and the Susan River below Willow Creek. Those rights, which are "divisible into two priority classes," are addressed in paragraph 45 and in Schedule 3 of the decree.[13]

The second set of interrelated rights are "[t]hose upon Gold Run Creek, Lassen Creek, Piute Creek and their tributaries, which are three separate units." Those rights, which are divided into priority classes within each unit, are addressed in paragraphs 41, 42, 43, and 46 and in Schedule 4 of the decree.

The third set of interrelated rights are "[t]hose upon Susan River and upon its tributaries above Piute Creek." Those rights, which are divided into eight priority classes, are addressed in paragraphs 44 and 47 to 52 and in Schedules 5 and 6 of the decree.

*The Irrigation Company's Rights Under The Decree*

The Irrigation Company has a first priority class right under Schedule 6 of the decree. That schedule gives the Irrigation Company the right to divert 36.65 cfs at

---

[13]    As with the stipulation for judgment, Schedule 1 of the decree consists of a description of the areas irrigated from the Susan River and its tributaries, and Schedule 2 of the decree consists of a list of the various points of diversion from the river and its tributaries.

Diversions 6, 7, 41, 55, and 239 to supply the company's 5,864.7 acres. Regarding that Schedule 6 right, paragraph 48 of the decree provides in relevant part as follows:

"Subject to all of the foregoing rights and provisions, the various parties hereinafter enumerated in Schedule 6 are entitled to rights in and to the use of the natural flow of Susan River and its tributaries during the seasons hereinbefore defined in paragraph 21, for domestic, stock-watering and irrigation purposes upon their respective lands as shown on said Division of Water Resources Map, and as hereinafter described under their respective names in Schedule 1, in accordance with the acreages to be supplied, priorities and quantities of water allotted, and through the diversions as set forth in said Schedule 6; . . . provided however, that diversion of all allotments set forth in said Schedule 6 shall be limited to the amounts directly applied to beneficial use with the exception of the allotments to Lassen Irrigation Company [and certain others] which may be diverted to storage."[14]

Among other things, paragraph 49 of the decree explains that "[a]ll rights in first priority class hereinafter set forth in said Schedule 6 are subject and inferior to all rights set forth in said Schedules 3, 4 and 5, but are superior in priority and in right to all other rights set forth in said Schedule 6."

In addition to its right to divert under Schedule 6, the Irrigation Company has a right to store water under paragraph 50 of the decree, as follows:

"Subject to the foregoing rights and provisions, Lassen Irrigation Company is entitled to impound the natural flow of Susan River and its tributaries in the McCoy Flat,

---

**14** Paragraph 48 also specifies that "diversion of the continuous flow equivalents of allotments provided in Schedule 6 may be made at twice the rates set forth in said Schedule 6 for one-half of the time during any 90-day period whenever water is available therefor." In referring to the Irrigation Company's right to divert 36.65 cfs under Schedule 6, we necessarily intend to include the concomitant right to divert at twice that rate for half the time in any 90-day period when water is available to divert at the higher rate.

15

Hog Flat, and Lake Leavitt Reservoirs at points designated respectively on Division of Water Resources Map as Diversions 6, 7 and 239 as hereinafter described in Schedule 2, in an amount equal to the present combined capacity of said reservoirs, or approximately 31,500 acre-feet per annum, during the season hereinbefore stated in paragraph 21, or as much of said amount of water as is impounded in said reservoirs . . . and thereafter withdrawn from said reservoirs during the period from January 1 to December 31 of each year and applied to beneficial use for domestic and stock-watering purposes and for the irrigation of the lands of the stockholders of said company as hereinafter described under the name of said company in Schedule 1."

Paragraph 21 of the decree, which is referenced in both paragraph 48 and paragraph 50 (and all of the other paragraphs in the decree granting water rights), and which lies at the heart of the dispute in this case, provides as follows:

"All diversion for domestic, stock-watering, municipal and industrial purposes under the rights hereinafter provided and for irrigation purposes under the rights of 'special class' hereinafter set forth in paragraphs 22 to 40, inclusive, shall be for continuous usage without regard to season; the season of diversion of water for general irrigation purposes under the rights hereinafter set forth in Schedules 3, 4, 5 and 6, shall be for continuous usage during the period from March 1, to October 31, both dates inclusive, of each and every year and during said period all rights set forth in said schedules shall be superior to the storage rights hereinafter provided in paragraphs 41, 42, 43, 44, 50, 51 and 52; except that no water shall be diverted through Diversions 106 to 114, inclusive, (said diversions being located as hereinafter described in Schedule 2) between June 20 and August 1 of each and every year; except further, that Lassen Irrigation Company shall be entitled to divert, or store up to the present capacity of its reservoirs, estimated at 31,500 acre-feet, from the natural flow of Susan River between March 1 and July 1 of each year when the flow of said Susan River is in excess of 20 cubic feet per second, measured immediately above the confluence of said river with

16

Willow Creek, and at all other times when the flow of said river is in excess of 5 cubic feet per second measured at said point, irrespective of and notwithstanding the allotments granted to users in said Schedules 3 and 6 and to users of third priority class in said Schedule 5 . . . and that during the period from November 1 of each and every year to the last day of February of the succeeding year, both dates inclusive, the rights hereinafter provided for the storage of the waters of said Susan River and its tributaries shall be superior to all irrigation rights, from said stream system, but said storage rights shall at all times be inferior and subject to the rights from said stream system for domestic, stock-watering, municipal and industrial purposes of the parties hereto, who require water from said stream system for said domestic, stock-watering, municipal and industrial purposes."

*The Present Dispute*

Dow owns four ranches and leases one; together, they comprise the Dow Ranch, on which he raises cattle and grows grass hay, alfalfa hay, alfalfa seed, corn, pasture, and grains. As the owner/lessor of these lands, Dow possesses a number of water rights governed by the Susan River decree amounting to an aggregate flow of 26.38 cfs under Schedules 3, 5, and 6 of the decree.[15] Dow's rights do not include any storage but instead are limited to diversion for direct application to beneficial use. All of Dow's points of diversion are downstream from the confluence of the Susan River and Willow Creek and thus below all of the Irrigation Company's points of diversion.

In the spring of 2008, Dow believed he was not receiving his full allotment of water under the decree, so he contacted the watermaster to find out what was

---

[15]     Specifically, Dow is entitled to 6.06 cfs under Schedule 3, 15.87 cfs under the third priority class in Schedule 5, and 4.45 cfs under the first priority class in Schedule 6.

happening.**16**  He was informed that the Irrigation Company was being allowed to divert water into Lake Leavitt even though the Irrigation Company was simultaneously releasing water from the reservoir for use by its shareholders.  Believing this was not permitted by the decree, Dow filed a complaint with the watermaster.  In his complaint, Dow asserted that the watermaster was " 'allowing [the Irrigation Company] to divert Schedule 6 water when Schedule 5 water is not at 100% allocation.' "  In essence, it was Dow's position that by diverting water into Lake Leavitt at the same time it was releasing water from the lake, the Irrigation Company was directly diverting water to beneficial use under its Schedule 6 right, which was in violation of the priorities in the decree since Schedule 5 users like Dow were not receiving all of their Schedule 5 water.

Ultimately, in May 2009, the watermaster formally denied Dow's claim.  The watermaster interpreted paragraph 21 of the decree as allowing the Irrigation Company to either store or directly divert to beneficial use up to 31,500 acre-feet per year.  Thus, the watermaster concluded that the Irrigation Company was not taking Schedule 6 water before all Schedule 5 users received their full allotment but instead was directly diverting water to beneficial use pursuant to its rights under paragraph 21 of the decree.

In December 2010, Dow filed a motion in the *Fleming* case (No. 4573) to interpret and enforce the decree.  By his motion, Dow asked the court to confirm that:  (1) the Susan River decree gives the Irrigation Company only two water rights, one for storage under paragraph 50 and one for direct diversion to beneficial use under Schedule 6; (2) nothing in the decree authorizes or empowers the Irrigation Company to divert its storage right under paragraph 50 for direct application to beneficial use; and (3) each year the Irrigation Company may fill each of its three reservoirs only once unless the Irrigation

---

**16**     Before 2008, the Department of Water Resources provided watermaster services on the Susan River.  In 2008, that role was assumed by the Honey Lake Valley Resource Conservation District (the watermaster).

Company uses water available under its Schedule 6 rights or water determined to be excess to the system. The main thrust of Dow's argument was that the watermaster erred in interpreting the decree to allow the Irrigation Company "to divert the continuous flow equivalent of 31,500 [acre feet] to be directly applied to a beneficial use."

The Irrigation Company opposed Dow's motion, contending that the decree "expressly allows [the Irrigation Company] to both divert or store Susan River water as long as certain flows are maintained in the Susan River."

The trial court sided with the Irrigation Company, concluding that the word "divert," as used in paragraph 21, means "diversion for direct application [to] beneficial use as opposed to storage." Based on this interpretation, the court concluded that paragraph 21 allows the Irrigation Company to either divert for direct application to beneficial use or store up to 31,500 acre-feet of water annually, subject to the minimum flow requirements immediately above Willow Creek.

Dow filed a timely notice of appeal from the order interpreting the decree.

DISCUSSION

On appeal, Dow contends the trial court erred in construing the Susan River decree with respect to the Irrigation Company's rights. We agree.

"The same rules apply in ascertaining the meaning of a court order or judgment as in ascertaining the meaning of any other writing. [Citation.] The rule with respect to orders and judgments is that the entire record may be examined to determine their scope and effect . . . ." (*L. A. Local etc. Bd. v. Stan's Drive-Ins, Inc.*, *supra*, 136 Cal.App.2d at p. 94.) "Individual clauses or provisions of a judgment, just as in a contract or any other document, are not to be separately considered and construed but, on the contrary, the entire document is to be taken by its four corners and construed as a whole to effectuate the obvious intention." (*Lazar v. Superior Court* (1940) 16 Cal.2d 617, 622.)

The main question here is whether, construing the Susan River decree as a whole, paragraph 21 of the decree can be reasonably understood as giving the Irrigation

19

Company the right to directly divert to beneficial use up to 31,500 acre-feet of water annually provided the flow requirements immediately above Willow Creek are met. The answer to that question is "no."

As Dow points out, construing paragraph 21 as giving the Irrigation Company a right to direct diversion not expressed elsewhere in the decree is inconsistent with the structure of the decree as a whole. As we have pointed out, paragraph 7 of the decree specifies that "the rights involved in [the underlying] action fall into four classifications" and then sets out those classifications as follows:

(a) Special class rights, as set forth in paragraphs 22 to 40;

(b) Interrelated rights on Willow Creek and the Susan River below Willow Creek, as set forth in paragraph 45 and Schedule 3;

(c) Interrelated rights on Gold Run Creek, Lassen Creek, Piute Creek and their tributaries, as set forth in paragraphs 41, 42, 43, and 46 and Schedule 4; and

(d) Interrelated rights on the Susan River and its tributaries above Piute Creek, as set forth in paragraphs 44 and 47 to 52 and Schedules 5 and 6.

Similarly, paragraph 19 explains that special class rights are "set forth in paragraphs 22 to 40" and interrelated rights are "set forth in paragraphs 41 to 52 . . . and in Schedules 3, 4, 5 and 6."

It is reasonable to conclude that if the court had intended paragraph 21 to give the Irrigation Company a right to direct diversion not found elsewhere in the decree, the decree would have included paragraph 21 in the lists of paragraphs in paragraphs 7 and 19. The fact that the decree does not do so supports Dow's position that paragraph 21 was not intended to give the Irrigation Company a right to direct diversion not expressed elsewhere in the decree.

This understanding is consistent with paragraph 21's apparent role in the decree, when it is examined in connection with the remainder of the decree. In each paragraph in which water rights are granted or recognized, the decree specifies that the direct diversion

20

or storage right can be exercised "during the season hereinbefore stated in paragraph 21." Thus, for example, paragraph 48 specifies that "the various parties enumerated in Schedule 6 are entitled to rights in and to the use of the natural flow of Susan River and its tributaries during the seasons hereinbefore defined in paragraph 21." As another example, paragraph 50 specifies that the Irrigation Company "is entitled to impound the natural flow of Susan River and its tributaries in the McCoy Flat, Hog Flat, and Lake Leavitt Reservoirs at points designated respectively on Division of Water Resources Map as Diversions 6, 7 and 239 as hereinafter described in Schedule 2, in an amount equal to the present combined capacity of said reservoirs, or approximately 31,500 acre-feet per annum, during the season hereinbefore stated in paragraph 21 . . . ."

From these multiple references, it seems apparent that paragraph 21 was not intended to grant any water rights, but instead was intended to *qualify* or *limit* rights granted elsewhere in the decree -- particularly by specifying *when* those rights can be exercised. To that end, paragraph 21 begins by providing that "[a]ll diversion for domestic, stock-watering, municipal and industrial purposes under the rights hereinafter provided and for irrigation purposes under the rights of 'special class' hereinafter set forth in paragraphs 22 to 40, inclusive, shall be for continuous usage without regard to season." In other words, paragraph 21 first makes clear that there is no seasonal limitation on water diverted for domestic, stock-watering, municipal and industrial purposes or on water diverted for irrigation purposes by those with special class rights.

Next, paragraph 21 addresses irrigation rights for those with interrelated rights under Schedules 3, 4, 5, and 6 by specifying that "the season of diversion of water for [those rights] shall be for continuous usage during the period from March 1, to October 31, both dates inclusive, of each and every year." Paragraph 21 then establishes the relative priority between these interrelated irrigation rights and the various "storage rights hereinafter provided in paragraphs 41, 42, 43, 44, 50, 51 and 52" by specifying that from March through October -- the period during which the interrelated irrigation rights may

21

be exercised -- those rights "shall be superior to" the storage rights.  What then follow are a series of exceptions to the foregoing provisions on season of use and priority of irrigation rights over storage rights.

Turning to the second of those exceptions (beginning with "except further"), which is the one at issue here, we can see that construing that exception as granting the Irrigation Company a right to directly divert to beneficial use up to 31,500 acre-feet of water annually -- as the trial court did here -- is not only inconsistent with the overall structure of the decree and with paragraph 21's apparent role in that structure (as we have explained), but it is also inconsistent with the grammatical structure of the exception itself.  The exception specifies that the "Irrigation Company shall be entitled to divert, or store up to the present capacity of its reservoirs, estimated at 31,500 acre-feet, from the natural flow of Susan River" at certain times subject to certain flow requirements immediately above Willow Creek.  "While not controlling, punctuation is to be considered in the interpretation of a [document]."  (*Duncanson-Harrelson Co. v. Travelers Indemnity Co.* (1962) 209 Cal.App.2d 62, 66.)  Where, as here, a phrase "is set off from the rest of the main sentence by commas," it "should be read as a parenthetical [phrase]" because such a grammatical structure "indicates an intent to segregate th[e] [phrase] from the rest of the sentence."  (*Ibid.*)

The Irrigation Company's (and the trial court's) reading of the language at issue fails to account for the use of the two commas to create a parenthetical phrase.  The Irrigation Company focuses on the word "or," which, as the Irrigation Company points out, "[i]n its ordinary sense . . . indicates an alternative such as 'either this or that.' "  (*Los Angeles County-U.S.C. Medical Center v. Superior Court* (1984) 155 Cal.App.3d 454, 461.)  According to the Irrigation Company, by its use of the word "or" the decree "expressly gives [the Irrigation Company] the right to either divert or store the subject water."  But this argument fails to account for the two commas that set off the phrase "or store up to the present capacity of its reservoirs, estimated at 31,500 acre-feet" from the

remainder of the sentence.[17]  Had the drafters of the decree intended the meaning that the Irrigation Company advances (and that the trial court found), there would have been no need for the comma before the word "or."[18]  But they included that comma, and we need to give it meaning if we can.  We do that by reading the phrase set off by commas as a parenthetical phrase.

Dow contends that parenthetical phrase -- "or store up to the present capacity of its reservoirs . . ." -- should be construed as "a parenthetical phrase explaining the meaning of the word 'divert.' "  Thus, Dow would have us read the phrase like this:  Lassen Irrigation Company shall be entitled to divert, *in other words,* store up to the present capacity of its reservoirs, estimated at 31,500 acre-feet, from the natural flow of Susan River.  This is a recognized use of the word "or."  (See, e.g., Black's Law Dict. (5th ed. 1979) p. 987, col. 2 [noting that "or" can be "used to clarify what has already been said, and in such cases, means 'in other words,' 'to-wit,' or 'that is to say' "].)  And this interpretation has the virtue of giving meaning to the two commas used to set off the phrase from the rest of the sentence by reading that phrase as parenthetical.  In our view, however, this interpretation does not properly capture the intended meaning of the exception in paragraph 21.

First of all, if the drafters of the decree had intended this exception in paragraph 21 to encompass only the Irrigation Company's right to store water in its reservoirs, there

---

[17]     In fact, this parenthetical phrase contains its own internal parenthetical phrase, "estimated at 31,500 acre-feet," which is itself set off by commas.  This internal parenthetical phrase serves to provide further detail as to what "the present capacity of [the Irrigation Company's] reservoirs" was at the time of the decree.

[18]     The comma following the word "acre-feet" still would have been needed, however, because it would still serve as the closing comma for the internal parenthetical phrase, "estimated at 31,500 acre-feet," even if there were no broader parenthetical phrase beginning with the word "or."

23

would have been no need to use the words "divert" or "or," or to use two commas to create a parenthetical phrase.  Instead, the provision could have simply provided that Lassen Irrigation Company shall be entitled to store up to the present capacity of its reservoirs, estimated at 31,500 acre-feet, from the natural flow of Susan River.  Or the drafters could have provided that the Irrigation Company "shall be entitled to divert to storage up to the present capacity of its reservoirs . . . ."  The least likely explanation for the language the drafters used is the one Dow advances -- that they intended the word "divert" to be the equivalent of "store up to the present capacity of its reservoirs, estimated at 31,500 acre-feet."

While we have concluded that neither the interpretation offered by the Irrigation Company nor the interpretation offered by Dow is satisfactory, there is a third option that recognizes the use of the two commas to create a parenthetical phrase (which the Irrigation Company's interpretation does not do) but at the same time gives the word "or" its more ordinary meaning (as a choice between alternatives) and does not result in an artificial explanation for the use of the parenthetical phrase (which Dow's interpretation does).  This alternate interpretation treats the parenthetical phrase "or store up to the present capacity of its reservoirs . . ." as an alternative to the word "divert."  Reading the clause in that manner results in the following understanding of the operative exception in paragraph 21:  "[B]etween March 1 and July 1 of each year when the flow of [the] Susan River is in excess of 20 cubic feet per second, measured immediately above the confluence of said river with Willow Creek, and at all other times when the flow of said river is in excess of 5 cubic feet per second measured at said point," the Irrigation Company "shall be entitled to" (1) "divert . . . from the natural flow of Susan River" "or" (2) "store up to the present capacity of its reservoirs, estimated at 31,500 acre-feet" "from the natural flow of Susan River."

Read in this manner, paragraph 21 does *not* grant the Irrigation Company the right to directly divert to beneficial use an amount of water equal to the capacity of its

24

reservoirs, as the trial court concluded.  This makes particular sense in light of the fact that nowhere else in the decree is a right to direct diversion to beneficial use expressed in acre-feet.  An acre-foot is "the volume (as of irrigation water) that would cover one acre to a depth of one foot."  (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 11, col. 2.)  Thus, it is a measure of water that is not moving.  Indeed, the decree consistently uses acre-feet to describe the amount of water that may be stored in a reservoir.  *Moving* water, on the other hand  -- that is, flowing water that is diverted for direct application to beneficial use -- is consistently described in the decree in terms of cubic feet per second.

While paragraph 21 does not specify how many cubic feet per second of water the Irrigation Company is "entitled to divert . . . from the natural flow of Susan River," that omission is easily explained in a manner consistent with our understanding of paragraph 21's role in the decree.  Because paragraph 21 does not grant any water rights, but instead only qualifies or limits water rights granted elsewhere in the decree, the reference to the Irrigation Company's right to "divert . . . from the natural flow of Susan River" must be a reference to a right to direct diversion to beneficial use granted somewhere else in the decree.  Because the Irrigation Company has only one right to direct diversion to beneficial use under the decree -- the right provided in Schedule 6 -- it follows that the reference in paragraph 21 to the Irrigation Company's right "to divert" must be a reference to the Irrigation Company's Schedule 6 right.

Understood in this manner, the exception in paragraph 21 under consideration serves to specify when the Irrigation Company may exercise its water rights under both Schedule 6 and paragraph 50 of the decree.  Specifically, notwithstanding the general provisions in paragraph 21 that the interrelated irrigation rights in Schedules 3, 4, 5 and 6 may be exercised only from March through October and that during that period those irrigation rights are superior to any storage rights in the decree, the Irrigation Company can either (1) divert under its Schedule 6 right, at up to 36.65 cfs, or (2) store up to the capacity of its reservoirs, estimated at 31,500 acre-feet, between March 1 and July 1

25

when the flow of the Susan River is in excess of 20 cfs immediately above Willow Creek and at all other times when the flow is in excess of 5 cfs.[19]

This interpretation of paragraph 21 of the decree is supported by the genesis of the language we are called on to interpret. To explain why, we need to delve back into some of the background facts set forth above.

Recall that as far back as 1893, it was recognized by the judgment in the *Byers* case that, at least as against the plaintiffs in that case, the Irrigation District's predecessors in interest had the right to divert to storage in their reservoirs as long as they maintained the 20 cfs/5 cfs minimum flows at Willow Creek. Now, fast forward to 1935. The Division, acting as referee in the stream adjudication of all rights in the Susan River stream system, recommended a plan for distribution of the water for the 1935 irrigation season based on an assumed duty of one cfs for every 80 acres of irrigated land, and virtually all of the water users agreed to that plan.

Under the 1935 agreement, certain rights on the Susan River and Willow Creek were set forth in Schedule 3. The paragraph governing that schedule specifically noted the Irrigation Company's entitlement "to divert under their right hereinafter provided" as long as the minimum flows from the *Byers* judgment were maintained at Willow Creek.

Schedule 4 in the 1935 agreement addressed additional rights on the Susan River, including a right for the Irrigation Company to directly divert 72.50 cfs under the first priority class in that schedule. The Irrigation Company was also entitled to divert this water to storage. Immediately thereafter, paragraph 22 of the 1935 agreement set forth the Irrigation Company's right to store water up to the capacity of its reservoirs.

---

[19] It should be noted that under the terms of paragraph 48, the Irrigation Company is entitled to divert water under its Schedule 6 right to storage as an alternative to diverting that water for direct application to beneficial use.

26

At this point, we pause to note that the paragraph governing Schedule 3 in the 1935 agreement contained an ambiguity with respect to the Irrigation Company, because it referred to the Irrigation Company's entitlement "to divert under their *right* hereinafter provided" (italics added) as long as the required minimum flows were maintained at Willow Creek. In fact, the 1935 agreement thereafter contained *two* diversion rights for the Irrigation Company: the right to divert 72.50 cfs either for direct application to beneficial use or to storage under Schedule 4 and the right to divert to storage up to the capacity of its reservoirs under paragraph 22. The agreement was ambiguous because it was not clear which of these rights the paragraph governing Schedule 3 in the 1935 agreement was meant to refer to.

With that noted, we move on to the stipulation for judgment. In the paragraph describing the water rights under Schedule 5 (Schedule 3 in the 1935 agreement), the same use of the singular "right hereinafter provided" appeared with respect to the Irrigation Company, even though the stipulation thereafter recognized the Irrigation Company's right to direct diversion (or diversion to storage) under Schedule 6 *and* the Irrigation Company's right to divert to storage under paragraph 41. Additionally, the new paragraph regarding seasons of use (paragraph 12) contained a similar provision recognizing that "diversion shall be made . . . by Lassen Irrigation Company" subject to the minimum flow requirements at Willow Creek. Like the language in the paragraph governing Schedule 5, this reference to a singular "diversion" was ambiguous, because the stipulation thereafter recognized that the Irrigation Company had *two* diversion rights -- the right under Schedule 6 and the right under paragraph 41.

As we have noted, the Irrigation Company signed the stipulation for judgment with a specific reservation regarding the construction of paragraph 12, and in its "Report of Referee" the Division proposed to the court that the language of the Irrigation Company's reservation be used virtually verbatim for the seasons of use paragraph in the judgment. Instead of simply providing that the Irrigation Company's "diversion" would

27

be subject to the minimum flow requirements at Willow Creek, the new language for the seasons of use paragraph provided that the Irrigation Company was "entitled to divert, or store up to the present capacity of its reservoirs, estimated at 31,500 acre-feet," subject to the minimum flow requirements at Willow Creek, and the new language provided that this entitlement was "irrespective of and notwithstanding the allotments granted to users in Schedules 3 and 6 and to users of third priority class in Schedule 5."[20]

By specifically referring to the Irrigation Company's right "to divert, or store up to the present capacity of its reservoirs, . . ." we believe this revision of the seasons of use paragraph was intended to make clear reference to the *two* water rights set forth thereafter for the Irrigation Company, which the singular word "diversion" did not previously do. In other words, it appears the Irrigation Company wanted to be sure it was understood that the Irrigation Company was entitled to operate under the exception set forth in paragraph 21 both in exercising its direct diversion rights under Schedule 6 as well as in exercising its right to divert to storage under paragraph 50.

This understanding of the language that the Irrigation Company proposed for use in paragraph 21 is bolstered by what happened to the reference to the Irrigation Company in the paragraph governing Schedule 5 between the stipulation for judgment and the decree itself. As we have noted, the stipulation for judgment referred to the Irrigation Company's entitlement "to divert under their right hereinafter provided . . . ." The decree, however, refers to the Irrigation Company's entitlement "to divert under their rights hereinafter set forth in paragraph 50 . . . ." The significance of this change is that the drafters of the decree found a way, in relation to Schedule 5, to refer only to the Irrigation Company's right to divert to storage in paragraph 50. Had the drafters intended

---

[20] The only change from the Irrigation Company's original proposal was to refer only to the third priority class in Schedule 5 rather than to all of Schedule 5 as the Irrigation Company had proposed.

the exception in paragraph 21 to have a similar limited scope, they reasonably could have been expected to use the same language. In other words, they could have written the exception in paragraph 21 to provide that the Irrigation Company shall be entitled to divert under their rights hereinafter set forth in paragraph 50 from the natural flow of Susan River. The fact that they did not do so, but instead referred to the Irrigation Company's entitlement "to divert, or store up to the present capacity of its reservoirs," supports the conclusion that the drafters specifically intended to refer to *something more* than just the Irrigation Company's storage rights under paragraph 50 by using this language. We believe the something more the drafters intended to refer to was the Irrigation Company's right to divert directly to beneficial use (or storage) under Schedule 6. Thus, the genesis of the language in paragraph 21 supports our construction of that language to mean that, as long as the minimum flows at Willow Creek are met, the Irrigation Company can either (1) divert under its Schedule 6 right, at up to 36.65 cfs, or (2) store up to the capacity of its reservoirs, estimated at 31,500 acre-feet.

Significantly, the exception in paragraph 21 pertaining to the Irrigation Company also specifies that the Irrigation Company's rights to divert and store water subject to the flow requirements immediately above Willow Creek are "irrespective of and notwithstanding the allotments granted to users in said Schedules 3 and 6 and to users of third priority class in said Schedule 5." This provision is significant because essentially it gives the Irrigation Company's rights a different priority than they would otherwise have under the terms of the decree. To truly understand the effect of this altered priority, it is necessary to take a closer look at the schedules in the decree.

First, it must be noted that the exception in paragraph 21 pertaining to the Irrigation Company's rights does not mention Schedule 4. This makes sense because, as we have noted, Schedule 4 involves rights on Gold Run Creek, Lassen Creek, and Piute Creek, which are all tributary to the Susan River. Because the Irrigation Company's points of diversion are all on the Susan River itself, the Irrigation Company's diversion of

29

water from the river can have no direct effect on those water users entitled to divert under Schedule 4, because those users take their water from the system before it ever reaches the Susan River.

Users (like Dow) entitled to water under Schedules 3, 5, and 6, or at least some of them, stand in a different position with respect to the Irrigation Company because their water rights *can* be affected by the Irrigation Company's exercise of its rights.[21]  As we have seen, however, the exception in paragraph 21 pertaining to the Irrigation Company entitles the Irrigation Company to exercise its rights "irrespective of and notwithstanding the allotments granted to users in said Schedules 3 and 6 and to users of third priority class in said Schedule 5."  The only users not mentioned in this clause are those in the first and second priority classes in Schedule 5.  A review of Schedule 5 reveals that the first and second priority classes in that schedule encompass points of diversion ranging from Diversion 2 to Diversion 54.  And an examination of the map included with the hydrographic report shows that all of those points of diversion lie along the Susan River *above* the confluence of the river with Willow Creek, with Diversion 54 being the last point of diversion on the river before Willow Creek.

What this means is that, provided the required flow immediately above Willow Creek is met, the exception in paragraph 21 pertaining to the Irrigation Company allows the Irrigation Company to exercise its rights to direct diversion under Schedule 6 or to storage under paragraph 50 irrespective of the allotments granted to all other users on the Susan River except for those with points of diversion above the confluence with Willow Creek.  In essence, then, the Irrigation Company must leave enough water in the river:

---

[21]  This is not true of users under Schedule 3 who take their water from Willow Creek above its confluence with the Susan River, nor is it true of the user entitled to divert from the Susan River at Diversions 2, 3, 4, and 5, because those points of diversion all lie above the Irrigation Company's first point of diversion (Diversion 6) at McCoy Flat Reservoir.

(1) to satisfy the users along the river from immediately below the McCoy Flat and Hog Flat Reservoirs down to the confluence of the river with Willow Creek (i.e., those users in the first and second priority classes in Schedule 5); and (2) to meet the minimum flow requirements immediately above Willow Creek.  If it does so, then the Irrigation Company can divert up to 36.65 cfs for direct application to beneficial use (or for storage) under its Schedule 6 right or it can store up to the capacity of its reservoirs, estimated at 31,500 acre-feet, under paragraph 50.

Based on this reading of the Susan River decree, we conclude the trial court erred in construing the decree with respect to the Irrigation Company's rights.  Specifically, the trial court was incorrect in its conclusion that under paragraph 21 the Irrigation Company has a right to direct diversion to beneficial use that is measured by the capacity of its reservoirs, estimated at 31,500 acre-feet.  The Irrigation Company's only right to divert for direct application to beneficial use is its right under Schedule 6, which is measured in cubic feet per second (36.65).

As we have explained, however, the Irrigation Company's right to divert under Schedule 6 is subject to the terms of paragraph 21, and those terms give the Irrigation Company's Schedule 6 right greater priority than it would otherwise have.  For example, as long as the minimum flow requirements immediately above Willow Creek are satisfied and the Irrigation Company leaves enough additional water in the river to satisfy the users on the river above the confluence with Willow Creek, the Irrigation Company can directly divert up to 36.65 cfs under its Schedule 6 right irrespective of other users like Dow with rights under the third priority class in Schedule 5 and the first priority class in Schedule 6.  And this is true even if the Irrigation Company has already stored all the water it is entitled to store under paragraph 50 of the decree.  That means there may be times when Dow is not receiving all of the water to which he is entitled under Schedules 5 and 6 but the Irrigation Company is able to divert water into an otherwise full Lake Leavitt at the same time it is simultaneously releasing water from the reservoir for use by

31

its shareholders. In such an instance, the water passing through the lake is water available to the Irrigation Company under its Schedule 6 right, which by the terms of paragraph 21 takes priority over Dow's rights.

Dow challenges this aspect of our interpretation of the decree on the ground that it conflicts with various other provisions in the decree relating to the issue of priority. We address (and reject) each of those arguments in turn.

First, he contends our interpretation of paragraph 21 conflicts with paragraph 48 and Schedule 6. As Dow points out, paragraph 48 provides that the rights of the parties enumerated in Schedule 6 are "[s]ubject to all of the foregoing rights and provisions" -- i.e., subject to the rights of the parties enumerated in Schedules 3, 4, and 5. Dow also observes that paragraph 48 provides that "all allotments set forth in said Schedule 6, which are within the same priority class, are equal in priority and corelative in right." Finally, Dow points out that Schedule 6 itself bears the title, "ALLOCATIONS TO VARIOUS WATER USERS FROM SUSAN RIVER STREAM SYSTEM SUBJECT TO ALLOCATIONS SET FORTH IN SCHEDULES 3, 4, and 5." In his view, all of these provisions serve to establish that Schedule 6 first class priority rights are inferior to rights under Schedules 3, 4, and 5, and equal to other Schedule 6 first class priority rights, and therefore our interpretation of the exception in paragraph 21 as giving altered priority to the Irrigation Company's rights under Schedule 6 creates a conflict in the decree.

This is not so, however, because, as even Dow has recognized, paragraph 48 provides that the rights of the parties enumerated in Schedule 6 are "[s]ubject to all of the foregoing rights and provisions." Among those "rights and provisions" are those set out in paragraph 21. Thus, paragraph 48 and Schedule 6 are expressly subject to whatever altered priority paragraph 21 creates for the Irrigation Company's rights, and therefore there is no conflict.

With respect to the decree's structure and schedules overall, Dow contends our interpretation of "[t]he Decree's 'altered priority' is inconsistent with the numbered

32

schedules and the priorities established between those schedules."  In effect, however, this argument adds nothing to Dow's previous argument.  Inasmuch as all of the paragraphs describing the interrelated rights under the schedules begin with the phrase "[s]ubject to all of the foregoing rights and provisions," all of those interrelated rights are subject to the provisions of paragraph 21, and whatever altered priority those provisions may impose.

Pointing to paragraph 49, however, Dow contends that our interpretation of paragraph 21 creates a conflict that cannot be reconciled like those we have just discussed because paragraph 49 does not begin with the same phrase.  Paragraph 49 of the decree provides in pertinent part that "[a]ll rights in first priority class hereinafter set forth in . . . Schedule 5 are superior in priority and in right to all other rights set forth in said Schedules 5 and 6; all rights in second priority class hereinafter set forth in said Schedule 5 are subject and inferior to said rights in first priority class set forth in said Schedule 5, but are superior in priority and in right to all other rights set forth in said Schedules 5 and 6; and all rights in third priority class hereinafter set forth in said Schedule 5 are inferior and subject to all other rights set forth in said Schedule 5, but are superior in priority and in right to all other rights set forth in said Schedule 6.  All rights in first priority class hereinafter set forth in said Schedule 6 are subject and inferior to all rights set forth in said Schedules 3, 4 and 5, but are superior in priority and in right to all other rights set forth in said Schedule 6; all rights in second priority class hereinafter set forth in said Schedule 6 are subject and inferior to said rights in first priority class set forth in said Schedule 6 and all rights in Schedules 3, 4, and 5, but are superior in priority and in right to all other rights set forth in said Schedule 5; and all rights in third priority class hereinafter set forth in said Schedule 6 are subject and inferior to all other rights set forth in said Schedule 6 and all rights set forth in said Schedules 3, 4, and 5."

As Dow observes, "[i]n this manner, Paragraph 49 establishes that the water rights in the lower numbered schedules are superior to the higher numbered schedules," and our

33

interpretation of paragraph 21 subverts that ordering of priorities to some extent by giving the Irrigation District's Schedule 6 rights higher priority than other Schedule 6 rights. We acknowledge that this is so, but we are nonetheless unpersuaded from our interpretation of paragraph 21 because to conclude otherwise would require us to accept Dow's construction of the exception clause in paragraph 21, which we have rejected already. It is also worth noting that paragraph 49 had no equivalent in the stipulation for judgment. Therefore, it appears that in preparing the final decree, the drafters decided that a new paragraph more explicitly describing the relationship between the various schedules and priority classes would be helpful. Inasmuch as paragraph 49 was an attempt to summarize the priority structure of the interrelated rights in the decree, it made sense not to begin that paragraph with the phrase, "[s]ubject to the foregoing rights and provisions," because paragraph 49 was an attempt to describe more explicitly the interrelation of those rights and provisions and thus was not itself subject to them.

What was missing from paragraph 49, however, was recognition that the exception clause in paragraph 21 altered the priorities of the schedules with respect to the Irrigation Company. This may have been a simple oversight in the final drafting of the decree. In any event, we do not believe this paragraph's failure to specifically mention that the Irrigation Company's Schedule 6 right was subject to altered priority under the provisions of paragraph 21 justifies construing paragraph 21 in the manner Dow proposes. In the end, taking everything we have discussed into account, and for all of the reasons previously set forth, we simply cannot accept Dow's construction of the exception in paragraph 21 as referring only to the Irrigation Company's storage rights under paragraph 50.

Dow also argues that our interpretation of paragraph 21 creates a conflict with paragraph 47, which governs Schedule 5 rights. Specifically, Dow argues that the exception in that paragraph relating to the Irrigation Company gives priority only to the Irrigation Company's storage rights under paragraph 50, and not to the Irrigation

Company's direct diversion rights under Schedule 6.  That is true, but we have explained already how this only serves to bolster our interpretation of the decree, because if the drafters had intended the exception in paragraph 21 to refer only to the Irrigation Company's storage rights under paragraph 50, they could have used the same language in paragraph 21 that they used in paragraph 47, but they did not do so.

Dow contends our construction of the decree renders portions of paragraph 21 meaningless because our construction "fails to give effect to the parenthetical phrase after the word 'divert' " and "construes the 'except further' clause . . . in a manner that makes it not an exception to the general premise that irrigation rights are superior to storage." We are not persuaded by either of these arguments.

First, with respect to the parenthetical phrase, we absolutely *do* give effect to it. As we have explained, under our interpretation that phrase operates as an alternative to the word "divert."  Indicating an alternative is the most "ordinary sense" of the word "or."  (*Los Angeles County-U.S.C. Medical Center v. Superior Court*, *supra*, 155 Cal.App.3d at p. 461.)  Dow is simply wrong in his assertion that a phrase operates as a parenthetical only if it is construed "to clarify and explain the preceding term."

Second, with respect to Dow's assertion that our interpretation does not make the exception clause "an exception to the general premise that irrigation rights are superior to storage," again we are unpersuaded.  As we have explained, we believe the history of the operative language shows that that language was inserted into the seasons of use paragraph at the behest of the Irrigation Company to clarify that it could exercise its right to direct diversion under Schedule 6 and/or its right to storage under paragraph 50 as long as the minimum flow requirements were met immediately above Willow Creek, subject only to the rights under the first and second priority classes in Schedule 5.  Whether the language the Irrigation Company proposed serves to make the exception as a whole operate as an exception to the narrow premise that irrigation rights are superior to storage rights -- which is only *one* of the premises in paragraph 21 -- is not dispositive to us.  Too

much else, as set forth above, weighs in favor of construing the language the way we have. Even as we have interpreted it, the exception clause relating to the Irrigation Company does express an exception to the seasons of use aspect of paragraph 21 and thus does not (contrary to Dow's argument) render "the phrase 'except further' meaningless."

Although we reject all of Dow's challenges to our interpretation of the decree, we nonetheless conclude that the trial court did not correctly interpret the decree, and we reverse the trial court's order and remand for the court to enter a new order consistent with our interpretation as set forth in this opinion.

DISPOSITION

The order is reversed and the case is remanded to the trial court to enter a new order consistent with this opinion. Dow shall recover his costs on appeal. (Cal. Rules of Court, rule 8.276(a)(1).)


                     ROBIE  , Acting P. J.


We concur:


  BUTZ  , J.


  MAURO  , J.