Filed 5/31/22
Separate opinion from 2/23/22 opinion

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| JAY DOW, as Trustee, etc., | C091965 |
| Plaintiff and Respondent, | (Super. Ct. No. 4573) |
| v. | |
| LASSEN IRRIGATION COMPANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Lassen County, Leonard J. LaCasse, Judge. Reversed.

Kronick, Moskovitz, Tiedemann & Girard, Scott A. Morris and William T. Chisum, for Defendant and Appellant.

Brownstein Hyatt Farber Schreck and Bradley J. Herrema, for Plaintiff and Respondent.

This is our third opinion interpreting provisions of the 1940 Susan River Water Rights Decree (decree) as it pertains to disputes between Jay Dow, as trustee for the Dow-Bonomini 2013 Family Trust (trust), and Lassen Irrigation Company (Irrigation Company) regarding the water rights allotted in the decree. (See *Dow v. Lassen Irrigation Co.* (2013) 216 Cal.App.4th 766 (*Dow I*); *Dow v. Honey Lake Valley Resource Conservation Dist.* (2021) 63 Cal.App.5th 901 (*Dow II*).)

1

In this appeal, the Irrigation Company challenges the superior court's orders interpreting paragraphs[1] 17 and 55 of the decree. The superior court adopted the trust's interpretations of those paragraphs, thereby overturning the contrary decisions by Honey Lake Valley Resource Conservation District, serving as the watermaster administering the decree (watermaster).[2] Although the superior court expressed an unfamiliarity with water law, it viewed the trust's interpretations of the paragraphs as "not ridiculously inconsistent with the objectives of the overall agreement" and "within the bounds of the agreement and . . . consistent with the language in the agreement."

The superior court interpreted paragraph 55 to recognize the 1931 judgment in *Barham v. Cannon*, Lassen County Superior Court Case No. 3037 (3037 Judgment) awarded water rights to the parties subject to that judgment (whose lands are now owned by the trust)[3] and excepted such water rights from being superseded by the decree. Paragraph 55 provides: "This judgment and decree shall supersede all former judgments and decrees as to the water rights involved, except the decrees of the above entitled Court in the cases of [the 3037 Judgment] and Frank Buffum, et ux. vs. Lasson [*sic*] Irrigation Company." Practically, the superior court interpreted paragraph 55 to recognize the trust is entitled to divert 740 acre feet of water under the 3037 Judgment, and such water rights

---

**1**    All further references to paragraph(s) are to paragraph(s) in the decree unless otherwise specified.

**2**    The watermaster also appealed the superior court's orders. We subsequently granted the trust's motion to dismiss the watermaster's appeal because the watermaster is not an aggrieved party within the meaning of Code of Civil Procedure section 902. (*Dow v. Lassen Irrigation Co.* (2022) 75 Cal.App.5th 482.)

**3**    In a declaration submitted by Dow on behalf of the trust in the superior court, Dow declared the trust owns all the lands subject to the 3037 Judgment. There is no dispute in that regard.

are superior to the water rights allotted in the decree and excepted from the provisions and requirements thereof.

The superior court further interpreted paragraph 17 to allow any water user with allotments in two or more ditches in different schedules of the decree, to unilaterally change the place of use from the acreages identified in one schedule to the acreages identified in another schedule (irrespective of where those lands are located in the Susan River stream system), provided the quantity of water diverted by the water user does not exceed the total of the water user's allotments under the decree.[4] Paragraph 17 provides, in pertinent part: "Nothing herein contained shall, or shall be construed to . . . prevent[] any party hereto, who has allotments to two or more ditches, from using all or any portion of his allotments through each or any number of his ditches on all or any portion of his land, so long as the maximum quantity of water diverted shall not exceed the aggregate of all allotments to all of his ditches." In the alternative, "[e]ven if the Watermaster were correct in its characterization of the meaning of Paragraph 17," the superior court found the trust's request to change the place of use as to some of its allotted water rights (which was denied by the watermaster), was otherwise consistent with Water Code section 1706 and "general principles of California water law."

We conclude the trust's interpretations of paragraphs 17 and 55, as adopted by the superior court, are unreasonable considering the language, record, history, and context of the decree. The superior court's finding the trust's place of use change request otherwise comports with Water Code section 1706 and California water law also does not save the paragraph 17 order. As we explain, at least a portion of the trust's allotted water rights subject to the place of use change request are riparian, and such rights may not be severed

---

**4**     As explained *post*, the allotted water rights in the decree as to specific parties are identified in different schedules; each schedule pertains to a different area of the Susan River watershed.

from the riparian land for use on other lands.  We accordingly reverse the superior court's orders in their entirety.

We further clarify the analytical framework for interpreting provisions of the decree to assist the superior court in resolving any future disputes between the parties. Because the superior court expressed an unfamiliarity with the unique subject of water law, the principles of which are essential to interpreting the decree's provisions, we include a brief discussion of California water rights *post* and explain how such principles impact the interpretation of the decree.

FACTUAL AND PROCEDURAL BACKGROUND

I

*The Susan River Stream System*

"The 'Susan River has its source on the east slope of the Sierra Nevada . . . in the southwesterly portion of Lassen County . . . at an elevation of about 7,900 feet.  Its channel follows a general easterly direction from Silver Lake through McCoy Flat Reservoir and through Susanville and on to Honey Lake to which it is tributary. . . .'

" 'Susan River has four important tributaries, namely, Piute Creek which comes in from the north at Susanville, Gold Run Creek and Lassen Creek which come in from the south between Susanville and Johnstonville, and Willow Creek which is tributary from the north above Standish.'

" 'Under normal conditions the flows of Lassen and Gold Run Creeks and of Susan River above Susanville are fairly well sustained from melting snows until early in June.' " (*Dow I*, *supra*, 216 Cal.App.4th at pp. 768-769, fn. omitted.)

II

*The Circumstances, Investigation, And Findings Leading Up To Entry Of The Decree*

"Before the litigation that led directly to the Susan River decree, there was a history of '[t]rouble' involving 'the use of water and ditches diverting [water] from Susan River.'  In 1893, a judgment was entered in a case involving water from the Susan River

4

entitled *J.D. Byers et al. v. Chas. K. Hartson, B. H. Leavitt, C. C. Hutchinson, et al.* (Super. Ct. Lassen County, 1893, No. 280)." (*Dow I*, *supra*, 216 Cal.App.4th at p. 771.) "From 1893 forward, 'various groups of water right owners [were] involved in a number of cases of water right litigation on Willow Creek, Gold Run Creek, Lassen Creek, Upper Susan River, and on Piute Creek.'" (*Ibid.*) The 3037 Judgment was the result of one such litigation.

## A

### *The 3037 Judgment*

The sole item in the record pertaining to the 3037 Judgment is the judgment itself. The parties have not provided copies of the complaint or any other portion of the record in the 3037 Judgment case.

The 3037 Judgment identifies A. C. Barham and Delta N. Barham (collectively the Barhams) as plaintiffs and E. T. Cannon, George F. Kelley, Maud R. Holmes, Fred E. Kelley, and Ruby B. Tehaney as defendants. The 3037 Judgment provides, "the plaintiffs have a superior right to divert and use of the waters of said Susan River for the irrigation of their said lands as riparian owners, six hundred (600) acre feet of water during each and every year, or the equivalent thereof in Miner's inches, as, for example, eighty (80) Miner's inches continuously, day and night, for one hundred fifty (150) days, or two hundred (200) Miner's inches continuously, day and night, for sixty (60) days, and to use said quantity of water continuously for fifteen days each month, and not otherwise, during that part of each year prior to the first day of July; and that defendants . . . be perpetually enjoined and restrained from diverting any water from said Susan River during the period of plaintiffs' use as aforesaid. And further that defendants . . . be perpetually enjoined from removing, molesting, or in any manner interfering with the three and one-half (3½) feet of flash boards in plaintiffs' dam in said Susan River, as particularly described in the complaint and findings, or the two feet of flash boards in

5

plaintiffs' bulkhead in the Fitzell Ditch as described in said findings, at any time or at all."

The 3037 Judgment further provides, the "defendants have a right, secondary and subordinate to that of the plaintiffs, to divert and use of the waters of said Susan River and the Fitzell Ditch one hundred forty (140) acre feet of water during [certain times] when plaintiffs are not using and are enjoined from using said waters of Susan River, as will aggregate, during the fifteen day interval of each month of the irrigation season prior to the first day of July, a total of one hundred forty (140) acre feet apportioned to the defendants, and that plaintiffs . . . be permanently enjoined from obstructing, molesting or interfering with the defendants' secondary and subordinate right to use the said quantity of water . . . during the irrigation season of each year prior to the first day of July, or the equivalent thereof in Miner's inches, and defendants' further right to make use of said water during fifteen days of each month of the irrigation season prior to the first day of July."

Finally, the 3037 Judgment provides that, "in view of the determination and decision of this Court that plaintiffs in this action are entitled to a prior and a superior right to divert and use of the natural flow of Susan River Six Hundred (600) acre feet of water for the irrigation of the lands of plaintiffs, described in this action; and in view of the determination and decision of this Court that the defendants have a right, secondary and subordinate to that of plaintiffs, to divert and use of the natural flow of Susan River for the irrigation of defendants' lands one hundred forty (140) acre feet of water during the irrigation season of each year until the first day of July of each year, that in the event that the natural flow of Susan River in its natural channel, measured at the points of diversion of the plaintiffs and defendants in this action, is less than two hundred miner's inches of water measured under a six (6) inch pressure, that plaintiffs shall have the prior and the preferred right to divert and to use for the irrigation of plaintiffs' lands, in case the said lands are dry and in need of irrigation, the whole of said quantity of water, thus

6

found to be under two hundred (200) miner's inches continuously until such time as plaintiffs have completed one full irrigation of their said lands, and one hundred fifty (150) acre feet is hereby determined and fixed as a sufficient quantity of water for one complete irrigation of plaintiffs' lands.  And under such conditions, it is further ordered that, thereafter, defendants shall be entitled to divert and use the entire flow of said Susan River when less than two hundred inches, continuously, but prior to July 1st, until such time as defendants have completed a full irrigation of seventy acres of land, and thirty-five acre feet measured on defendants' premises is hereby fixed as a sufficient quantity of water for one full irrigation of defendants' seventy acres of land."

B

*The Proceeding To Quell Piecemeal Litigation And Comprehensively*

*Adjudicate The Water Rights In the Susan River Stream System*

"The narrow scope of the issues involved [in the various water rights litigation among and between water users in the Susan River stream system] rendered unsatisfactory results from the various cases, because as conditions changed different combinations of issues arose which threatened expensive and continued litigation.  In view of this situation, more than ninety per cent of the water right owners entered into an agreement during the summer of 1934 to seek an adjudication of each right in respect to all other rights in the Susan River stream system under the court reference procedure of [former] Section 24 of the Water Commission Act."  (*Dow I*, *supra*, 216 Cal.App.4th at p. 771.)

"In July, 1934, [several] plaintiffs commenced an action in the Superior Court of Lassen County against some two hundred defendants to quiet title to their asserted rights in and to the use of the waters of the Susan River."  (*Fleming v. Bennett* (1941) 18 Cal.2d 518, 520.)  "The plaintiffs and the defendants [were] or represent[ed] all of the users of the water in the Susan River watershed."  (*Id*. at p. 521.)  " 'The case was referred by [the superior] court to the [former] Division of Water Resources [(Division)] on August 21,

7

1934, under the provision of [former] section 24 of the Water Commission Act for investigation and report as referee." (*Dow I*, *supra*, 216 Cal.App.4th at p. 771.)

" 'A survey and map of the diversions and irrigated lands in the Susan River stream system and an investigation of record facts were made by the referee between August 25, 1934 and March 15, 1935. A conference of the water users and their representatives was held at Susanville on March 18, 1935 to acquaint them with the data that had been collected by the Division. A program of future action for expeditio[u]s conduct of the investigation of [the] referee was discussed with the water users at the conference.

" 'In order to expedite an investigation by the referee of the use of water on Susan River and its tributaries, a tentative schedule for the distribution of waters during the 1935 season was recommended to the water users. The plan of distribution . . . was agreed upon by all of the water users except the owners of the Ridenour, Satica, and Jenkins ranches . . . . The schedule of allotments was based upon an assumed duty of one cubic foot per second to eighty acres of irrigated land and the plan of distribution was to be operative during the 1935 season only. The agreement contained a provision that the legal rights of the various parties should in no way be prejudiced by such distribution of water. It was further agreed that the conference with the Division should be continued until a date to be later fixed by the Division, said date to be subsequent to the end of the 1935 season, when the results of the distribution under the agreement would be available. Water master service was furnished as an incident of the investigation from March 23 to October 17, 1935.' The 1935 agreement was based in part on the fact that it 'appear[ed] from the data collected by [the] Division that it m[ight] be possible to work out an allocation of the waters of [the Susan River] stream system . . . that w[ould] be acceptable to all of [the] parties [to the suit] and afford the basis for a consent judgment in [the] proceedings.' " (*Dow I*, *supra*, 216 Cal.App.4th at pp. 771-772, fn. omitted.)

8

"In February 1936, following the trial distribution under the 1935 agreement, the Division completed the hydrographic report." (*Dow I*, *supra*, 216 Cal.App.4th at p. 773.) The hydrographic report was "comprehensive. It consist[ed] of 195 pages of findings and conclusions and as many or more pages of schedules, tables and plates. It deal[t] with and recommend[ed] findings with respect to 259 claimed rights of water users in the Susan River watershed. The[] suggested findings, conclusions and tables [were based on] the physical facts investigated by the referee. There [wa]s also included a general description of the watershed, reports on climate, soil classification, crops, run-off records, the various uses of the water and descriptions of 259 diversion systems and measurements, tabulation and report on supplemental springs and reservoirs, description of methods of irrigation, a discussion and report on losses and accretions in channels and ditches [(specifically addressing channel losses and return flow on the one hand and conveyance losses and drainage flow on the other)], a chapter devoted to the duty of water, or general irrigation and domestic requirements in the various sections, and a discussion of certain of the allotments compiled in the schedules or tables. Table 1, compris[ed] 41 closely tabulated sheets, contain[ed] specific descriptions of the areas irrigated from the Susan River and its tributaries and the names of the respective owners of such areas. Table 2, compris[ed] 12 sheets, g[ave] a summary of the systems diverting water from the Susan River and its tributaries, the names of the diverters and of the diversions, the acreage irrigated under each diversion, and the total acreage irrigated on each parcel. Other tables g[a]ve the monthly and seasonal precipitation in the seasons 1900-01 to and including 1934-35, the records of temperatures, dates of killing frosts and snowfalls at Susanville, and the continuous records of daily and monthly discharges and releases in cubic feet per second [(cfs)] of Susan River and its tributaries at designated points in various years. Similar tables g[a]ve estimated daily consumptions, diversions, and rediversions, accretions, and daily water supply. Table 86 g[ave] the estimated crop yields on about 50 typical lands irrigated from the Susan River and its tributaries. Table

9

87 report[ed] the gross use of water for acreage irrigated from the Susan River and its tributaries during the period of investigation in 1935. Many maps and graphs [were] included." (*Fleming v. Bennett*, *supra*, 18 Cal.2d at pp. 525-526.)

The hydrographic report states, "[t]he lands irrigated from Susan River between Johnstonville and the Colony Dam, including the lands irrigated under the A and B Canal, [(which further include diversions 46 and 47 subject to the place of use change request in this appeal)] appeared to have excessive drainage therefrom between May 15 and June 25, 1935. The drainage from other lands irrigated from Susan River approximated an amount to be expected under normal conditions." Following a tabulation of water supply and discharge, the Division wrote: "The aggregate gross consumption of water in the area during this period was . . . equal to 2970 acre feet on 3290 acres of irrigated land. The actual diversions made for this area during that time were approximately 4550 acre feet. The drainage passing Colony Dam out of the area was thus equal to 1580 acre feet. Since most of the drainage returns to the river and is available for rediversion on the Hansen, Coulthurst, and Johnston and Chappius lands, the aggregate amount of water supplied to the 3290 acres of irrigated land in this area during the period under consideration appears to be about 20 per cent [*sic*] more than was necessary for the proper irrigation thereof. [¶] Excluding the above area of 3290 acres, the remaining area of 8860 acres irrigated from Susan River in 1935, as set forth in Table 87, made a fairly uniform use of water of one cubic foot per second to 79 acres."

"[F]ollowing the Division's production of its comprehensive hydrographic report, '[a]nother conference of the parties to the action and their representatives was called by the Division of Water Resources on March 31, 1936, at Susanville. A stipulation for judgment containing a plan of settlement of all of the water rights in the Susan River stream system was presented by said Division at the conference. The stipulation was based upon the 1935 schedule of trial distribution with such modifications as appeared

10

necessary from the additional information gathered in 1935.' " (*Dow I*, *supra*, 216 Cal.App.4th at pp. 773-774.)

The plaintiffs and defendants, except, among others, the Barhams, agreed to the written stipulation for judgment. The Division "announced its report in the form of a draft," and the Barhams filed three objections thereto, as follows: (1) "A claim is made for an additional area of approximately 85 acres of irrigated riparian land owned by these objectors"; (2) "The amount of water specifically awarded to the C. F. Hart lands, now owned by May L. Leavitt, is not clearly stated, and that the diversion of the allotment to said lands should be subject to the provisions of the [3037 Judgment]";[5] and (3) "Additional water is claimed for the above mentioned riparian land with the same duty as set forth for the 189.9 acres described in the Draft of Report of Referee." The Division addressed the Barhams' objections in the Report of Referee (referee's report).

Responding to the Barhams' first objection, the Division corrected a misunderstanding as to the specific tract of land, stating the tract of land "is riparian, susceptible of irrigation, has been irrigated, and has the same basis of right as the remaining area of 189.9 acres irrigated by said objectors." The Division explained the description of the Barhams' lands had been amended. In that regard, in responding to the Barhams' third objection, the Division clarified: "The allotment of water hereinbefore found to be necessary and proper for the 248.0 acres of irrigated land owned by these objectors is 3.10 [cfs] rather than 2.37 [cfs] as formerly found in the Draft of [*sic*] Report of Referee. All or any portion of said 3.10 [cfs] may be diverted from Susan River by means of the Barham Dam but not more than 1.67 [cfs] through the A and B Canal."

As to the Barhams' second objection, the Division wrote: "The amount of water herein found to be proper and necessary to meet the water requirements on the C. F. Hart

---

**5**      Presumably, Leavitt was a successor in interest to one or all of the defendants in the 3037 Judgment litigation.

lands, now owned by May L. Leavitt, is 2.20 [cfs]. This allotment to said C. F. Hart lands is subject to all the provisions of the [3037 Judgment] as hereinbefore set forth in Finding XVI."

In the findings of fact portion of the referee's report, the Division wrote the Barhams were the owners of 248 acres of land irrigated by waters from the Susan River and "said lands are depicted in green upon Map Sheet No. 3 of Exhibit 'A' hereof; that said owners divert and use, and are entitled to divert and use, water from Susan River upon said lands for domestic, stock watering and irrigation purposes by means of the A and B Canal and the Barham Ditch (designated on said Map Sheet respectively as Diversions 41 and 46)," the coordinates of which were specifically set forth in the referee's report.

The Division further wrote, "the total amount of water which said owners divert, and are entitled to divert, through said diversions is 3.10 [cfs], or its equivalent if rotated, or as much thereof as they directly apply to beneficial use; that said owners divert, and are entitled to divert, all or any portion of said total amount of water through said Barham ditch, but not more than 1.67 [cfs], through said A and B Canal; that said owners divert, and are entitled to divert, said water from said Susan River during the period from March first to October thirty-first, both dates inclusive, of each year; that said owners use, and are entitled to use any drainage waters that may at any time flow onto said lands; that said amount of water which said owners are herein found to divert, and to be entitled to divert, is sufficient and adequate to properly supply the requirements of said owners for use upon said acreages for said purposes and is all the water reasonably necessary therefor; that the right herein found for said owners in the use of said Barham Ditch and diversion dam together with the right herein found for May L. Leavitt is subject to the [3037 Judgment]; and that the right to said amount of water from the natural flow of said Susan River which said owners are herein found to divert, and to be entitled to divert, is inferior and subject to the aggregate of first priority gross diversion rights from said Susan River

of 15.95 [cfs], is equal in priority and correlative in right with the aggregate of other second priority gross diversion rights from said river of 64.45 [cfs], and is superior to all other rights to the natural flow of said Susan River."

The Division explained it made the continuous flow allocations in the referee's report based on specific duties of water. " 'The term "duty of water" has been defined to mean the quantity of water necessary to properly irrigate a given tract of land.' " (*Dow I*, *supra*, 216 Cal.App.4th at p. 772, fn. 9.) For some allocations, the duty of water was based on a "consumptive duty of one cubic foot per second" to a specific number of acres irrigated from Willow Creek, Lassen Creek, and Piute Creek. For other allocations, the duty of water was based on a "gross duty of one cubic foot per second" to a specific number of acres irrigated from Gold Run Creek. Pertinent to the allotted rights at issue in this appeal, the continuous flow allocations were based on "[a]n average net duty of one cubic foot per second to each 110 acres of lands irrigated under the A and B Canal from Susan River" and "[a] gross duty of one cubic foot per second to each 80 acres of irrigated land in the remainder of the Susan River stream system."

In the conclusions of law section of the referee's report, the Division identified lands riparian to the Susan River and its tributaries. Pertinent to this appeal, the Division stated, "all of the acreages hereinbefore found as owned by [the Barhams] . . . are riparian to Susan River." The Division further recommended: "The judgment and decree in this action should supersede all former judgments and decrees as to the water rights involved, except the decrees of the above entitled court in the cases of [the 3037 Judgment], and Frank Buffum, et ux. vs. Lassen Irrigation Company, No. 4099."

The referee's report constitutes "prima facie evidence of the facts reported" (*Fleming v. Bennett*, *supra*, 18 Cal.2d at p. 527, italics omitted) and the hydrographic report constituted the record supporting the referee's report.

13

III

*The Decree*

The superior court entered the decree in 1940.  (*Fleming v. Bennett*, *supra*, 18 Cal.2d at p. 520.)  The superior court also entered a supplemental order providing for watermaster supervision in accordance with the provisions of the decree.  (*Ibid*.)  The decree and supplemental order were upheld by our Supreme Court in 1941.  (*Id*. at p. 530.)  We discuss only the provisions of the decree pertinent to this appeal.

The decree provides, "said report of referee with subsequent substitutions and dismissals of parties as shown by the record herein is affirmed and adopted as the basis for the decree of this Court determining and establishing the several rights in and to the use of the waters of Susan River and its tributaries involved in said cause."  Schedule 1 of the decree[6] contains the descriptions of areas irrigated from the Susan River and its tributaries, providing legal descriptions of the irrigated acreages under the name(s) of each water user party.[7]  Schedule 2 provides a description of the approximate location of the points of diversion from the Susan River and its tributaries as to each diversion number shown on the Division of Water Resources Map.[8]

Paragraph 19 provides, "[t]he various parties to said action are entitled to 'special class' and 'interrelated' water rights," identifying four classifications of water rights.  "The first set of rights, addressed in paragraphs 22 through 40 . . . , are of 'independent

---

[6]     All further references to schedule(s) are to the schedule(s) in the decree unless otherwise noted.

[7]     We use the term water user party because the acreages are identified under the names of individuals, multiple individuals, corporations, and governmental entities.

[8]     The Division of Water Resources Map is defined as the map prepared by the Division "from its surveys made in 1934 and 1935, which map consists of ten sheets and is entitled, 'Susan River Stream System showing Diversions and Irrigated Lands,' is dated 1935, and is on file with the records in the above entitled action."

character and absolute priority' because under those rights 'the respective parties take all of the flow of various springs and small tributaries and have for more than five years prior to the commencement of this action long continued to do so.' The decree describes these rights as ' "special class" ' water rights and characterizes them as 'independent of each other' and as 'superior in priority and in right to all other rights in the Susan River stream system.' "

"The decree describes the other three sets of water rights as 'interrelated' water rights. The first set of interrelated rights is: '[t]hose which derive their water supply from Willow Creek' and the Susan River below Willow Creek. Those rights, which are 'divisible into two priority classes,' are addressed in paragraph 45 and in schedule 3 . . . .

"The second set of interrelated rights is: '[t]hose upon Gold Run Creek, Lassen Creek, Piute Creek and their tributaries, which are three separate units.' Those rights, which are divided into priority classes within each unit, are addressed in paragraphs 41, 42, 43, and 46 and in schedule 4 . . . .

"The third set of interrelated rights is: '[t]hose upon Susan River and upon its tributaries above Piute Creek.' Those rights, which are divided into eight priority classes, are addressed in paragraphs 44 and 47 to 52 and in schedules 5 and 6 . . . ." (*Dow I*, *supra*, 216 Cal.App.4th at pp. 776-777, fn. omitted.)

Paragraph 20 provides, in pertinent part: "The various parties to the above entitled action are entitled to use of the waters of the Susan River stream system upon, and are the owners and in possession of the irrigated lands hereinafter described under their respective names in Schedule 1; all of the allotments of water hereinafter provided shall be diverted from said Susan River stream system at the present points of diversion of the respective ditches, as said points of diversion are hereinafter described in Schedule 2; and the points of measurement of all allotments of water hereinafter provided shall be at or near the respective points of diversion from said Susan River and its tributaries except as to the allotments hereinafter provided for [several water users not at issue in this

15

appeal] . . . ." Paragraph 21 discusses the seasons of use pertinent to the four classifications of decreed rights.[9] And, paragraph 49 details, at length, the priority of the rights in the different schedules and priority classes in those schedules in relation to one another.

Pertinent to this appeal, the decree awarded the Barhams two schedule 5 (second priority) water rights for their 248 acres of land: (1) 1.67 cfs from Diversion 41 for use on 133.6 acres; and (2) 1.43 cfs from Diversion 46 for use on 114.4 acres. Schedule 5 further allots second priority rights to Leavitt of 2.20 cfs from Diversion 47 for 96.9 acres.

Paragraph 47 provides, in pertinent part: "Subject to all of the foregoing rights and provisions, the various parties hereinafter enumerated in Schedule 5 are entitled to rights in and to the use of the natural flow of Susan River and Lower Willow Creek during the seasons hereinbefore stated in paragraph 21, for domestic, stockwatering and irrigation purposes upon their respective lands as shown on said Division of Water Resources Map, and as hereinafter described under their respective names in Schedule 1, in accordance with the acreages to be supplied, priorities and quantities of water allotted, and through the diversions from the sources named as set forth in Schedule 6 . . . ." The decree defines "natural flow" as "such flow as will naturally occur at any given point in a stream from the run-off of the watershed which it drains, from springs which naturally contribute to the stream, from seepage, and from waste and return flow from dams, conduits, and irrigated lands; as distinguished from released stored water and from 'foreign water' directly conveyed to a stream from another watershed."

---

[9]     The paragraph is discussed in greater detail in *Dow I*, *supra*, 216 Cal.App.4th at pages 778-779.

16

IV

*The Present Dispute*

In 2007, the superior court appointed Honey Lake Valley Resource Conservation District as the watermaster to replace the California Department of Water Resources, effective January 1, 2008.  The watermaster employs a deputy watermaster.[10]  In 2019, the trust, a party and successor in interest to parties allocated water rights in the decree, submitted two requests to the deputy watermaster.

First, the trust asked the deputy watermaster to administer the decree in a manner allowing the trust to divert 25 cfs until June 30, 2019, under water rights purportedly granted to the trust's predecessors in interest in the 3037 Judgment.  The trust relied on paragraph 55, arguing it expressly states the decree did not supersede the water rights granted to the trust's predecessors in interest under the 3037 Judgment.

Second, the trust requested to change the place of use for some of its decreed water rights to its properties downstream from the points of diversion identified in the decree.  The trust argued it had the right to do so under paragraph 17 because it has allotments in two or more ditches and its diversion would not exceed the aggregate of all of its allotments to all of its ditches.

The deputy watermaster denied both requests, reasoning the place of use change would injure and interfere with other water users' rights, and "there is not enough material to support that the 3037 [Judgment] are stand alone water rights" separate from the water rights adjudicated and identified in the decree.

The trust filed two appeals with the watermaster advisory committee, challenging the deputy watermaster's decisions.  After the watermaster advisory committee denied

---

[10]     All further references to deputy watermaster are to the watermaster's deputy watermaster unless otherwise specified.

the appeals, the trust appealed to the watermaster board. The watermaster board also upheld the deputy watermaster's decisions.

As to the 3037 Judgment challenge, the watermaster board denied the trust's request to receive 740 acre feet of water under the 3037 Judgment, stating the 3037 Judgment "does not adjudicate water rights in addition to those adjudicated to the Barham users in the Susan River Decree; but simply adjudicates the superiority of water rights between users that share a ditch. Such understanding is based on the fact that in the [3037 Judgment], there are no Points of Diversions described, nor are there legal descriptions, or any information of irrigated lands in this document, except for the defendants being said to have 70 acres of land. In the [decree] [the Barhams] are allotted a total of 3.10cfs at diversions 41 and 46; the defendants in the [3037 Judgment] are not allotted any rights in the [decree]. It is only presumed, based on the Decreed names, that the locations of diversion and use of the water described in the [3037 Judgment] are at the diversions 46, known as Barham, and 47 known as Kelley, cited in the [decree] under Schedule 2: Points of Diversion from Susan River and its Tributaries. The Watermaster came to the conclusion that these presumptions, and lack of descriptions associated with the [3037 Judgment] do not prove it to be a standalone document, adjudicating additional water rights to the ones clearly defined in the [decree]. Additionally, there is no record of the 'complaint' or 'findings' referred to in the 3037 [Judgment], which would hold more information on the happenings that preceded the Judgement [*sic*]. Furthermore, on June 17, 2019 upon receiving Mr. Dow's request 'to take 25 [cfs] of my Barham Kelley Decree water . . . ', the Watermaster had to make a timely decision on the use of a significant amount of Susan River water and concluded that there is not enough evidence proving that the Barham Kelley 3037 Judgement [*sic*] is anything more than a dispute resolution between adjacent water users."

As to the trust's paragraph 17 challenge, the watermaster board interpreted the decree as "not allowing the use of Schedule 4 and Schedule 5, 2nd priority water rights

18

below the confluence of the Susan River and Willow Creek." The board further found "the allowance of this movement of water would obstruct [the Irrigation Company's] water rights under the terms described in the Decree and [*Dow I*]." The board stated, however, it supported the trust "taking the steps to change the Points of Diversion with the Superior Court."

The trust then sought relief in the superior court. The watermaster and the Irrigation Company, a party allocated water rights in the decree, opposed the trust's motion for relief.

V

*The Superior Court's Orders*

The superior court agreed with the trust's interpretations of paragraphs 17 and 55. The trial judge explained: "I'm the first to admit that I'm sure that the Watermaster and everybody in the room knows a lot more about water than I do. All I do is fish in it. But I have to give deference to the language as it states, and I believe that words in an agreement or in a contract, the constitution for that matter, mean something and we have to give them meaning as long as they're not ridiculously inconsistent with the objectives of the overall agreement, and I don't see that in this case. I'm not persuaded by either Lassen Irrigation District's argument or the Honey Lake Watermaster's argument that this is going to have a massive impact and disruption on the entire 1940 agreement. . . .

"So I am going to direct counsel for moving party to prepare an order and supporting recitals and findings in support of each order that you're asking for that is consistent with your request and no more. . . . I think I understand the case. I'm willing to admit I may be wrong but that's for other people to decide. But based on everything I've heard and read I think the requests are within the bounds of the agreement and are consistent with the language in the agreement."

The superior court directed the trust to prepare the proposed orders. After the trust submitted the proposed orders to the superior court, the watermaster and the

19

Irrigation Company filed their respective objections thereto. The superior court denied the objections and filed the orders as prepared by the trust.

The first order states paragraph 17 is interpreted to allow the trust to "divert its Schedule 4 and Schedule 5 Priority 2 allotments through each or any number of its ditches on all or any portion of its lands, so long as the maximum quantity of water diverted shall not exceed the aggregate of all allotments to all of its ditches." The superior court additionally found the trust's "requested change would not result in any negative impact or injury to any other water user in the Susan River system, and is permitted under Water Code section 1706" because the change "would not increase the quantity of water it diverts beyond the amounts as stated in the Decree, nor would the change increase the amount of total acreage to which water is delivered and irrigated." The superior court directed the watermaster to vacate its decision "and to take all steps necessary to allow [the trust] to divert its Schedule 4 and Schedule 5 Priority 2 water rights at its ditches on all or any portion of its lands."

The second order states paragraph 55 is interpreted to expressly recognize "the 3037 Judgment established water rights," and to exempt such water rights from being superseded by the decree. The superior court directed the watermaster to vacate its decision "and to take all steps necessary to administer the Decree in a manner that does not interfere with [the trust's] ability to exercise the water rights involved in the 3037 Judgment in future irrigation seasons."

The watermaster and the Irrigation Company appealed the superior court's orders. We previously dismissed the watermaster's appeal and now consider the merits of the Irrigation Company's appeal.

DISCUSSION

I

*Clarification Of The Analytical Framework For*

*Interpreting The 3037 Judgment And The Decree*

The interpretation of a judgment or decree is a question of law subject to a court's de novo review. (*Dow II*, *supra*, 63 Cal.App.5th at p. 911.) We have explained that " '[t]he same rules apply in ascertaining the meaning of a court order or judgment as in ascertaining the meaning of any other writing.' " (*Dow I*, *supra*, 216 Cal.App.4th at p. 780.)

The interpretation of a writing "must be fair and reasonable, not leading to absurd conclusions." (*Transamerica Ins. Co. v. Sayble* (1987) 193 Cal.App.3d 1562, 1566.) "If the [writing] is capable of more than one reasonable interpretation, it is ambiguous [citations], and it is the court's task to determine the ultimate construction to be placed on the ambiguous language by applying the standard rules of interpretation in order to give effect" to the evident purpose of the writing. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 798; *Mahon v. County of San Mateo* (2006) 139 Cal.App.4th 812, 821.) "[L]anguage in a [writing] must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. [Citation.] Courts will not strain to create an ambiguity where none exists." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18-19.) Thus, as we explained in *Dow I*, we examine the entire record to determine the scope and effect of a judgment and decree and construe the writing as a whole, rather than interpret individual provisions in isolation. (*Dow I*, *supra*, 216 Cal.App.4th at pp. 780-781.)

To appropriately frame the circumstances of the case, we consider the context within which the decree and 3037 Judgment were entered. Both writings pertain to water rights. *We thus consider water law principles as appropriate and necessary to provide the essential context within which we may ascertain the intent of the parties and the*

21

*superior court.*[11]  (See *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912 [intent is determined by objective manifestations, including "the object, nature and subject matter" of the writing].)  Given the superior court's expressed unfamiliarity with water law principles, we provide the following brief but important background as to riparian and appropriative water rights to assist in any future interpretations of the decree.

"Ownership of California's water is vested generally in the state's residents, but individuals and entities can acquire 'water rights,' the right to divert water from its natural course for public or private use.  [Citations.]  California maintains a 'dual system' of water rights, which distinguishes between the rights of 'riparian' users, those who possess water rights by virtue of owning the land by or through which flowing water passes, and 'appropriators,' those who hold the right to divert such water for use on noncontiguous lands.  [Citation.]  For historical reasons, California further subdivides appropriators into those whose water rights were established before and after 1914.  Post-1914 appropriators may possess water rights only through a permit or license issued by the [State Water Resources Control] Board, and their rights are circumscribed by the terms of the permit or license.  Riparian users and pre-1914 appropriators need neither a permit nor other governmental authorization to exercise their water rights.  [Citation.]  Inevitably, given the nature of the resource, 'water rights are limited and uncertain.  The available supply of water is largely determined by natural forces.' " (*Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463, 1477-1478, fns. omitted.)

---

[11]     We express no opinion as to the interpretation of a judgment or decree purporting to disregard or change the underlying nature of the parties' water rights (e.g., riparian or appropriative).  Those are not the circumstances presented here, nor has any party advanced any such argument on appeal.

22

There are several distinguishing characteristics between riparian and appropriative uses. "The *appropriation doctrine* contemplates the acquirement of rights to the use of water by diverting water and applying it to reasonable beneficial use for a beneficial purpose, in accordance with procedures and under limitations specified by constitutional and statutory law or acknowledged by the courts. The water may be used on or in connection with lands away from streams, as well as lands contiguous to streams. The first appropriator of water from a particular watercourse in point of time has the prior exclusive right to the use of the water to the extent of his appropriation, without material diminution in quantity or deterioration in quality, whenever the water is available. Each later appropriator has a like priority with respect to all those who are later in time than himself. The appropriative right relates to a specific quantity of water, and is good as long as the right continues to be exercised. The right may be acquired for any use of water that is beneficial and reasonable." (Hutchins, The California Law of Water Rights (1956) p. 40.) An appropriator may change the point of diversion, place of use, or the use to which the water was first applied, *if others are not injured by the change*. (Wat. Code, § 1706; *Orange Cove Irrigation Dist. v. Los Molinos Mutual Water Co.* (2018) 30 Cal.App.5th 1, 19.)

"The *riparian doctrine* accords to the owner of land contiguous to a watercourse a right to the use of the water on such land. The use of the water is limited to riparian land. The water may be used for domestic, stock watering, irrigation, power, and various other beneficial purposes. The use of the water for irrigation purposes must be reasonable in relation to the reasonable requirements of all other owners of lands riparian to the same source of supply. Now -- although not formerly -- the use must be reasonable likewise with respect to appropriative rights on the same stream. The riparian right is not based upon use, and in the absence of prescription it is not lost by disuse. No riparian owner acquires priority over other riparian owners by reason of the time of beginning use of the water. The riparian right is proportionate, not exclusive. It is not measured by a specific

23

quantity of water except when apportioned by a court decree adjudicating the rights of the riparian owners among themselves, the decree being based upon then existing conditions and the apportionment being subject to change when the relative conditions change; or except in an adjudication of riparian rights as against appropriators of surplus water." (Hutchins, The California Law of Water Rights, *supra*, pp. 40-41.)

II

*Paragraph 55 Does Not Except Or Recognize*

*Independent And Superior Water Rights In The 3037 Judgment*

Paragraph 55 provides: "This judgment and decree shall supersede all former judgments and decrees as to the water rights involved, except the decrees of the above entitled Court in the cases of [the 3037 Judgment] and Frank Buffum, et ux. vs. Lasson [*sic*] Irrigation Company." There is no dispute the trust is the owner of all of the properties described in the 3037 Judgment, and thus owns the water rights associated therewith, if any.

The trust argues, "[t]he plain language of Paragraph 55 explicitly preserves 'the water rights involved' in the 3037 Judgment from being superseded by the Decree." In essence, the trust reads paragraph 55 to mean the decree shall supersede all former judgments and decrees, except as to the water rights involved in the 3037 Judgment. As explained in the trust's petition filed in the superior court, the trust believes the water rights purportedly granted in the 3037 Judgment are "paramount."

The Irrigation Company in contrast argues "[t]he better argument is that Paragraph 55 is intended to retain the provisions of the 3037 Judgment as to water diversion and ditch use as to the limited parties subject to the 3037 Judgment but not to award duplicative water rights."

We conclude the trust's interpretation of paragraph 55, and the interpretation adopted by the superior court in that regard, is unreasonable considering the language, record, history, and context of the decree.

24

Prior to the decree, "there was a history of '[t]rouble' involving 'the use of water and ditches diverting [water] from Susan River' " and the various water right cases litigating such rights yielded unsatisfactory results "because as conditions changed different combinations of issues arose which threatened expensive and continued litigation." (*Dow I*, *supra*, 216 Cal.App.4th at p. 771.) As stated in the decree, "[a]ll of the water users in the *entire* watershed of said Susan River [were thus] involved in the [decree] action." (Italics added.) The purpose of the decree was to adjudicate " 'each right in respect to *all other rights* in the Susan River stream system.' " (*Dow I*, at p. 771, italics added.)

To determine the extent and scope of the water users' rights for the foregoing purpose, the Division prepared the hydrographic report with engineering data "relative to the water supply and water requirements *of the lands involved in the [decree] proceedings*, which data were collected during a field investigation made under the supervision of [the supervising hydraulic engineer]." (Italics added.) In other words, the hydrographic report analyzed the relative water supply and water requirements *for lands owned by all of the water users in the entire watershed of the Susan River*.

The "investigation included measurements of the water supply and of the various diversions from the stream system, a study of the duty of water on the irrigated lands, and a survey of the diversion systems and irrigated areas." The "report was 'comprehensive. It consist[ed] of 195 pages of findings and conclusions and as many or more pages of schedules, tables and plates. It deal[t] with and recommend[ed] findings with respect to 259 claimed rights of water users in the Susan River watershed.' " (*Dow I*, *supra*, 216 Cal.App.4th at p. 773.) The hydrographic report constituted the record supporting the referee's report and the referee's report in turn was adopted as the basis for the decree.

The trust points us to nothing in the hydrographic report or referee's report, nor have we located anything therein, identifying or analyzing independent and superior water rights in the 3037 Judgment. This is significant because, had the intent been to

25

except such independent and superior water rights from being superseded by the decree, we would expect to see a discussion in that regard. Plainly, if the water subject to such rights were not part of the *supply availability* for the decreed water rights, the hydrographic report would have mentioned it. The whole purpose of the hydrographic report was to present engineering data relative to the water supply and water requirements of the lands owned by *all* water users in the entire Susan River stream system to comprehensively adjudicate and decree water rights in respect to "*all other rights* in the Susan River stream system." (*Dow I*, *supra*, 216 Cal.App.4th at p. 771, italics added.)

It is further significant the language in paragraph 55 as to the 3037 Judgment exception originated in the referee's report. In the conclusions of law section of the referee's report, the Division proposed the language later adopted as paragraph 55 and, in responding to the Barhams' objections, explained "the right *herein* found for [the Barhams] in the use of said Barham Ditch and diversion dam together with the right *herein* found for May L. Leavitt *is subject to the [3037 Judgment]*."[12] (Italics added.) The referee's report further states the water allocated to the Barhams and Leavitt *in the decree* based on the hydrographic report was sufficient and adequate to meet the water requirements at their properties.

The foregoing directly cuts against the trust's interpretation of paragraph 55 and indicates the intent of the exception was to render *the decreed water rights* allocated to the Barhams and Leavitt (i.e., the trust's predecessors in interest) subject to the provisions of the 3037 Judgment, e.g., the Barhams' priority of use vis-à-vis Leavitt and the

---

[12] It is unclear whether Leavitt succeeded to the rights of all defendants subject to the 3037 Judgment. It is further unclear whether the lands of the parties subject to the 3037 Judgment were all allotted rights under the decree. The trust has provided no information in that regard. We note, however, the water rights identified in the 3037 Judgment as to the Barhams were riparian, as were the water rights allotted to the Barhams in the decree.

respective injunctions between those parties to avoid interference with each of the parties' rights and the Barhams' flash boards.[13] By adopting the referee's report as the basis for the decree, and including verbatim the Division's proposed language as to the 3037 Judgment exception in paragraph 55, we presume the parties and superior court read, understood, and agreed with the referee's recommendation in the context of the water rights allotted under the decree.

Further, courts, like the Legislature, do not " ' "hide elephants in mouseholes." ' " (*Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1171.) Some of the most important aspects of a water rights adjudication pertain to the scope and priority of using allotted water rights. Such provisions provide certainty to water users regarding the appropriate hierarchy and scope of water use in times of scarcity. The decree expressly addresses the priority of use for the different classes of water users. Under the trust's interpretation, paragraph 55 recognizes water rights under the 3037 Judgment independent from the priority of use provisions of the decree. Simply stated, the trust asserts it has "paramount" rights in comparison to the water rights allotted in the decree because the 3037 Judgment rights are not subject to the provisions of the decree.

Had the parties and superior court intended for the decreed water rights to be subordinate to purported water rights in the 3037 Judgment, undoubtedly the decree would have contained an express provision in that regard, or there would have been a mention of the purported superior rights in the record.[14] It defies logic that such an

---

[13] Such provisions appear to be moot given it is undisputed the trust owns the lands subject to the 3037 Judgment.

[14] Indeed, the referee's report, which constitutes the basis for the decree identified riparian rights that were never used and thus "inferior and subject to all said other rights herein found in and to said waters"; parties "who have no right, title or interest in and to the waters of the Susan River stream system, but who have some color of title thereto or

27

important aspect pertaining to the adjudication of the water users' rights would be buried in an oblique reference to the 3037 Judgment in paragraph 55, particularly when paragraph 7 describes the set of rights in paragraphs 22 through 40 as " ' "special class" ' " water rights and characterizes them as 'independent of each other' and as 'superior in priority and in right *to all other rights in the Susan River stream system*.' " (*Dow I*, *supra*, 216 Cal.App.4th at p. 776, italics added.) If any "other rights in the Susan River stream system" had priority and superiority over the water rights allotted in paragraph 7, undoubtedly the water users and superior court would have expressly addressed such an important provision.

We also do not interpret the 3037 Judgment as adjudicating and awarding a specific quantity of water to the parties subject to the 3037 Judgment as against other water users in the watershed, as the trust suggests. As explained *ante*, a riparian right "is not measured by a specific quantity of water except when apportioned by a court decree adjudicating the rights of the riparian owners *among themselves*, . . . ; or except in an adjudication of riparian rights as against appropriators of surplus water." (Hutchins, The California Law of Water Rights, *supra*, p. 41, italics added.)

The 3037 Judgment arose from a dispute between a small number of water users. The superior court in that case could not have adjudicated or awarded the Barhams a total of 600 acre feet of water associated with their riparian rights in the 3037 Judgment as *against other water users in the Susan River stream system* who were not parties to that action. Nor could the court have adjudicated any appropriators' rights to *surplus* water. At most, the superior court adjudicated the priority of the rights between the parties to the 3037 Judgment. In other words, the superior court adjudged the Barhams would have the

_____

claim some right therein, who should be restrained from interfering with the flow of water in said stream system"; and "parties who have no color of title and claim no right, title or interest in and to the waters of the Susan River stream system, and as to whom a dismissal of this action should be made."

28

priority in using the water specified in the 3037 Judgment *vis-à-vis the defendants*. If the water availability exceeded that, the defendants could use up to the volume of water identified in the 3037 Judgment. The other purpose of the judgment was to enjoin each of the parties from taking certain actions potentially injurious to another party.

Plainly, the decree was intended to constitute a comprehensive adjudication of *all* water users' rights in the Susan River stream system. The trust's predecessors in interest were allotted the water rights identified in the decree, nothing more. We thus reverse the superior court's order interpreting paragraph 55 to the contrary.

III

*Paragraph 17 Does Not Create More Favorable Rights For*

*Water Users With Allotments In Multiple Ditches*

Paragraph 17 provides: "Nothing herein contained shall, or shall be construed to, prevent any of the parties hereto, who have a joint ditch, where there is a continuous flow allotment to said ditch, from employing by agreement of such joint users of said ditch a system of rotation in use as among themselves, or from preventing any party hereto, who has allotments to two or more ditches, from using all or any portion of his allotments through each or any number of his ditches on all or any portion of his land, so long as the maximum quantity of water diverted shall not exceed the aggregate of all allotments to all of his ditches."

The trust interprets the second clause in paragraph 17 to allow any water user with allotments in two or more ditches in different schedules, to unilaterally change the place of use of an allotment from the acreages identified in one schedule to the water user's acreages in another schedule (irrespective of where those lands are located in the Susan River stream system), provided the quantity of water diverted does not exceed the total of the water user's allotments under the decree. Specifically, the trust asked the watermaster to allow it to "divert water arising under [its] Schedule 4 and Schedule 5 Priority 2 rights for use upon [its] properties that are situated below the confluence of

29

Susan River and Willow Creek." In the trust's view, the limitation that the quantity of water diverted shall not exceed the total of the water user's allotments under the decree adequately prevents any injury to other users in the watershed.

The Irrigation Company disagrees with the trust's interpretation, asserting the interpretation is unreasonable because "[a]llowing for the transfer of water for use miles downstream would cause significant injury to other users in the watershed and negatively impact the Watermaster's ability to administer the Decree in a manner that respects the water rights and priorities of all users." In its view, "the trial court's order paid little to no consideration of [*sic*] this important element."

We conclude the trust's interpretation is unreasonable when considered in the context of water law and when the decree is read in tandem with the record. Focusing on the first point, the trust's interpretation would create illogical distinctions between water users holding the same water rights, i.e., riparian or appropriative water rights. We find no intent in the decree or record to support such distinctions.

As to appropriative rights, it is a "well settled rule of California water law" that a party with a decreed appropriative right may change the place of use if the party can do so *without injuring other water users' rights*. (*Barnes v. Hussa* (2006) 136 Cal.App.4th 1358, 1369; Wat. Code, § 1706.) As we explained in *Barnes*, "[i]njury from a change in place of use generally occurs when use at the new location results in the appropriator using a greater amount of water than he was entitled to [citation] *or when use at the new location reduces return flows to the watercourse*, thus reducing the amount of water available for diversion by downstream users [citation]." (*Barnes*, at p. 1369, italics added.) In other words, irrespective of paragraph 17, each user with a decreed appropriative right may change the place of use for that right, but the injury calculus tied to the change extends to more than simply the amount of water used. Under the trust's interpretation of paragraph 17, however, the parties and the superior court intended to

30

treat a subset of water users with decreed appropriative rights differently and more favorably.

Under the interpretation advanced, an appropriative water user with decreed allotments in two or more ditches may change the place of use as long as it results in no greater diversion than the total of the user's decreed allotments; whereas an appropriative water user with an allotment in a single ditch may only do so if the change causes no injury to other users, including that the change does not reduce return flows. We can discern no rational basis supporting such a distinction between users holding the same type of water right, i.e., decreed appropriative water rights. Nor have we found any basis for such a distinction in the decree or record. Nothing in the decree or record indicates an intent to treat water users with allotments in more than one ditch more favorably than those with allotments in a single ditch.

The trust's interpretation also leads to an illogical result with respect to riparian rights. As explained *ante*, the use of a riparian right is limited to application of the water *on riparian land*. (Hutchins, The California Law of Water Rights, *supra*, p. 40.) Under the trust's interpretation, a riparian water user (such as the Barhams) with allotments in two or more ditches may change the place of use -- thereby severing the water rights from the riparian land -- but a riparian water user with an allotment in a single ditch may not. Indeed, the riparian water user with an allotment in a single ditch may not change the place of use under Water Code section 1706, like an appropriative water user may choose to do. (*Orange Cove Irrigation Dist. v. Los Molinos Mutual Water Co.*, *supra*, 30 Cal.App.5th at p. 20 [Wat. Code, § 1706 does not apply to riparian rights].) And, no other provision in the decree would allow the riparian water user with an allotment in a single ditch to do so either. Even assuming the decree could give a riparian water user the right to sever the water rights from the riparian land, a question we need not decide, it is illogical, without more in the record and decree, that the parties and superior court intended to give that right to only riparian water users with decreed allotments in two or

31

more ditches. There is no indication of any such intent in the decree or record. Nor is there any indication of an intent to treat riparian water users differently in that regard.

The trust's interpretation is further unreasonable when the decree is read in tandem with the record. It is apparent from the detailed analysis in the hydrographic report regarding the watershed, climate, soil conditions, crop water utilization, run-off records, channel losses, return flow, drainage flow, and conveyance losses, and the comprehensive and complicated schedule and priority class structure implemented by the decree that the identified places of use were important aspects in quantifying and establishing the priority of the water users' rights. In fact, given the analysis in the hydrographic report, the referee's report specified different water duties for different lands in the Susan River stream system. In that regard, the water rights allotted to the different parties were identified in different schedules pertaining to different parts of the Susan River stream system. (*Dow I*, *supra*, 216 Cal.App.4th at pp. 776-777.) Each water user's decreed right relates to a specific point(s) of diversion and identified acreages. It is further clear return flow was considered part of the natural flow allocated to the water users in the decree.

Paragraph 47 for example provides water users with schedule 5 rights are entitled to use "the natural flow of Susan River and Lower Willow Creek," and paragraph 8 defines "natural flow" to include "waste and return flow from dams, conduits, and irrigated lands." The hydrographic report states that "[w]hen drainage from irrigated lands returns to natural channels it is designated as return flow as distinguished from drainage flow in ditches." Plainly, when a water user changes the place of use, the characteristics of the new location and the use at that location may impact another user's rights because the change may impact the return flow (and thus the natural flow) a user would otherwise receive at the prior location as part of the water user's allotment under the decree.

At bottom, the trust's interpretation of paragraph 17 simply does not square with water law, the decree, or the record. Based on the complicated and detailed analysis as to the location of the various parcels in the watershed, and the different schedules and priorities imposed on water use at the identified acreages (including an analysis of drainage and return flows), it is anomalous to suggest the parties and superior court intended for all water users with allotments in more than one ditch *in different schedules* (pertaining to different portions of the Susan River watershed) to receive more favorable treatment in changing the place of use of their allotments simply based on the number of ditches to which they received allotments.

Further, we reiterate, courts, like the Legislature, do not " ' "hide elephants in mouseholes." ' " (*Jones v. Lodge at Torrey Pines Partnership*, *supra*, 42 Cal.4th at p. 1171.) Had the parties and the superior court intended to allow a more liberal transfer of places of use from one portion of the watershed to another for only some parties to the decree, it would have been plain from the language of the decree. (Cf. *Orange Cove Irrigation Dist. v. Los Molinos Mutual Water Co.*, *supra*, 30 Cal.App.5th at pp. 18-19 [decree "expressly authorized each water rights owner to use its share of the water allotted to it 'in any manner, at any place, or for any purpose' or according to whatever agreement it enters into with others"].)

For all the foregoing reasons, we disagree with the superior court's order interpreting paragraph 17 as advanced by the trust. That does not, however, end our inquiry as to that order because the superior court also found the trust's place of use change was consistent with Water Code section 1706. We conclude the superior court erred in making that finding as well.

As we explained *ante*, at least a portion of the water rights subject to the place of use change request (i.e., the Barhams' rights) are riparian in nature and not subject to Water Code section 1706. (*Orange Cove Irrigation Dist. v. Los Molinos Mutual Water Co.*, *supra*, 30 Cal.App.5th at p. 20.) The trust has advanced no argument with citations

33

to the record and authorities in the superior court or on appeal that the parties and superior court intended to disregard the underlying nature of the water rights allotted in the decree. The trust is, of course, not precluded from making any such arguments in the future, should it choose to do so. We consider only the arguments presented in this appeal.

In sum, we reverse the superior court's order in favor of the trust as to its request to change the place of use.

## DISPOSITION

The superior court's orders are reversed, and the matter remanded to the superior court to enter new orders denying the trust's appeals of the watermaster's decisions. The Irrigation Company shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1)-(2).)


/s/ _____
Robie, J.

We concur:


/s/ _____
Hull, Acting P. J.


/s/ _____
Earl, J.